**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| JOHN DOE I and JANE DOE I, on behalf of themselves and all others similarly situated, | |
| *Plaintiffs*, | Civil Action No. _____ |
| v. | |
| MEDSTAR HEALTH, INC. and CERNER CORPORATION, | **JURY TRIAL DEMANDED** |
| *Defendants*. | |

**CLASS ACTION COMPLAINT**

# TABLE OF CONTENTS

**INTRODUCTION** ............................................................................................................. 1

**NATURE OF THE ACTION** ........................................................................................ 1

**PARTIES TO THE ACTION** ...................................................................................... 6

**JURISDICTION AND VENUE** .................................................................................. 6

**FACTUAL ALLEGATIONS** ....................................................................................... 7

    The MyMedStar Patient Portal ................................................................................. 7

    What Happens When a Patient Communicates with MedStar at Defendants' Patient
      Portal .......................................................................................................................... 17

        Re-directed Patient Identifiers to www.Google-Analytics.com .......................... 18

        Re-directed Patient Identifiers to Google.com ...................................................... 19

        Re-directed Patient Identifiers to Doubleclick.net ................................................ 20

        Google Properties to Which Defendants Redirect Patient Data ......................... 21

        Defendants' Actions Permit Google to Connect the Data Across the Different
          Domains ................................................................................................................. 21

    Google's Advertising and Analytics Services ................................................................. 22

    IP Addresses Are Personally Identifiable ...................................................................... 26

    Internet Cookies Are Personally Identifiable ................................................................ 27

    Browser-Fingerprints Are Personally Identifiable ........................................................ 30

    The Personally Identifiable Data and Communications Defendants Use and Disclose
      Without Patients' Knowledge, Consent, Authorization, or Further Action Has Value
      .................................................................................................................................... 31

    Defendants' Duties of Confidentiality ........................................................................... 33

        Duties Under Federal Law ....................................................................................... 33

        Ancient and Modern Industry Standards of Patient Confidentiality .................... 46

        Confidentiality Is a Cardinal Rule of the Provider-Patient Relationship ............. 47

    Defendants Assure Patients That They Protects Patients' Personally Identifiable
      Information ................................................................................................................ 48

    Plaintiffs' Reasonable Expectations of Privacy .............................................................. 50

**CLASS ACTION ALLEGATIONS** ................................................................................ 51

**COUNT I:** Violation of the Electronic Communications Privacy Act, 18 U.S.C. § 2511(1)—
    Wiretap Interception .................................................................................................. 55

**COUNT II:** Violation of the Electronic Communications Privacy Act, 18 U.S.C. § 2511(3)—
    Wiretap Divulgence by an ECS Provider .................................................................. 61

**COUNT III:** Violation of the Electronic Communications Privacy Act, 18 U.S.C. § 2702(a)(1)—

Divulgence of Stored Communications Content by an ECS Provider ................................... 66

**COUNT IV:** Violation of the Electronic Communications Privacy Act, 18 U.S.C. § 2702(a)(2)—Divulgence of Stored Communications Content by an RCS Provider .................................. 71

**COUNT V:** Violation of the Maryland Wiretapping and Electronic Surveillance Act, Md. Code Ann., Courts and Judicial Proceedings, § 10-401, *et seq.* ......................................... 74

**COUNT VI:** Violation of the Maryland Confidentiality of Medical Records Act, Md. Code Ann., Health General Article, § 4-301, *et seq.*................................................................. 79

**COUNT VII:** Invasion of Privacy—Intrusion Upon Seclusion .................................. 82

**COUNT VIII:** Breach of Contract ........................................................................ 86

**COUNT IX:** Trespass to Chattels ........................................................................ 90

**REQUEST FOR RELIEF** ..................................................................................... 93

**JURY DEMAND** ............................................................................................... 94

## INTRODUCTION

Plaintiffs John Doe I and Jane Doe I on behalf of themselves and all others similarly situated patients (collectively "Plaintiffs"), upon personal knowledge as to Plaintiffs' own conduct and on information and belief as to all other matters based upon investigation of counsel, such that each allegation has evidentiary support or is likely to have evidentiary support upon further investigation and discovery, and for their Class Action Complaint against Defendants MedStar Health, Inc. ("MedStar") and Cerner Corporation ("Cerner") (collectively, "Defendants"), state as follows:

## NATURE OF THE ACTION

1.      Plaintiffs bring this action against Defendants MedStar and Cerner for Defendants' joint action to divulge their individually identifiable health information to Google via Google's marketing systems known as Google Analytics, Google Ads, and Google Display Ads when patients exchange communications with MedStar on its online patient portal.

2.      There should be no dispute that Defendants' conduct violates reasonable expectations of patient privacy. MedStar promises patients that "myMedstar is a free, secure online patient portal where you can keep track of your health information 24/7." It does not provide patients with any warnings or clues that using the patient portal results in MedStar and its patient portal provider (Cerner) depositing Google cookies on patients' personal computing devices and subsequently divulging their protected health information and information about the substance, purport, and meaning of communications with MedStar to Google and its advertising systems.

3.      Nor should there be any dispute that Defendants' conduct is unlawful. In December 2022, the Office of Civil Rights at the United States Department of Health and Human Services ("HHS") issued a bulletin ("the Bulletin") reminding covered entities like MedStar and Cerner of their patient privacy obligations "when using online tracking technologies." HHS expressly stated that "[t]racking on user-authenticated webpages … such as a patient or health plan beneficiary

1

portal" must comply with the HIPAA privacy rule and all information relating to such use by patients must be "protected and secured in accordance with the HIPAA Security Rule."[1]

4.      Similarly, Google warns covered entities like Defendants:[2]

## Can Google Analytics be used in compliance with HIPAA?

Customers must refrain from using Google Analytics in any way that may create obligations under HIPAA for Google. HIPAA-regulated entities using Google Analytics must refrain from exposing to Google any data that may be considered Protected Health Information (PHI), even if not expressly described as PII in Google's contracts and policies. Google makes no representations that Google Analytics satisfies HIPAA requirements and does not offer Business Associate Agreements in connection with this service.

For HIPAA-regulated entities looking to determine how to configure Google Analytics on their properties, the HHS bulletin ☑ provides specific guidance on when data may and may not qualify as PHI. Here are some additional steps you should take to ensure your use of Google Analytics is permissible:

- Customers who are subject to HIPAA must not use Google Analytics in any way that implicates Google's access to, or collection of, PHI, and may only use Google Analytics on pages that are not HIPAA-covered.

- Authenticated pages are likely to be HIPAA-covered and customers should not set Google Analytics tags on those pages.

- Unauthenticated pages that are related to the provision of health care services, including as described in the HHS bulletin, are more likely to be HIPAA-covered, and customers should not set Google Analytics tags on HIPAA-covered pages..

- Please work with your legal team to identify pages on your site that do not relate to the provision of health care services, so that your configuration of Google Analytics does not result in the collection of PHI.

5.      Despite patients' reasonable expectations and clear directives that use of Google marketing tools inside of an "authenticated" patient portal is unlawful, MedStar and Cerner

---

[1] Office for Civil Rights, Department of Health and Human Services, *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates* (Dec. 1, 2022), https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html.
[2] Google, *HIPAA and Google Analytics*, https://support.google.com/analytics/answer/13297105?hl=en (highlighting added).

divulge the protected health information anyway.

6.    Medstar and Cerner do so through a multi-step process.

    a.    *First*, Defendants require patients to have first-party cookies enabled to access the "secure" myMedStar Patient Portal. This requirement is a general security and usability standard for "authenticated" websites. First-party cookies are typically used to confirm that the user is who they say they are when they sign-in – and to keep them signed-in as they exchange communications within "authenticated" portions of a website.

    b.    *Second*, the Defendants place, enable, or permit the placement of Google source code on the MyMedstar patient portal.

    c.    *Third*, when a patient visits the portal or clicks to login to the portal, the Google source code that Defendants choose to place, enable or permit places Google cookies on the patient's communications device that are disguised as "first-party" cookies belonging to MedStar or Cerner. By disguising the Google cookies as MedStar or Cerner cookies, the Defendants prevent patients from blocking the deposit of the Google cookies through the use of third-party cookie blockers. In addition, because Defendants require the use of first-party cookies to access the portal, Defendants assure that all patients who enter the portal will have the Google cookies placed on their device.

    d.    *Fourth,* the Google source code that MedStar and Cerner place in the portal commands the patient's computing device to re-direct and divulge patient and device identifiers and the content of patient communications to Google

3

via its various marketing services at www.Google-Analtyics.com, www.Google.com, and www.doubleclick.net.

e.    *Fifth,* MedStar uses the information for marketing purposes.

7.    MedStar and Cerner do not make any attempt to obtain patient consent for this.

8.    To the contrary, the myMedStar Terms of Use expressly incorporates by reference and hyperlink MedStar Health's Notice of Privacy Practices under its "General Terms and Conditions" paragraph, stating, "You further agree that a copy of MedStar Health's Notice of Privacy Practices is available to you at the bottom of each page of the System and provides information on how your Protected Health Information (PHI) is used at MedStar Health."[3]

9.    The document also contains a prominent hyperlink to "Privacy Policy," which incorporates by hyperlinked reference the Notice of Privacy Practices for MedStar Health published at https://www.medstarhealth.org/patient-privacy-policy. Among other things, the Notice of Privacy Practices contains a list of purposes for which it may disclose patient health information. Neither marketing nor website analytics appear on the list of permitted purposes. Instead, MedStar promises, "Other uses and disclosures of your health information not covered by this Notice, or the laws that govern us, will be made only with your written authorization. These include the sale of your health information, use of your information for marketing purposes, and certain disclosures for psychotherapy notes." There is no mention of Google, Google Analytics, Google Ads, or Google Doubleclick.

10.    The Patient Privacy Policy / Notice of Privacy Practices also promises patients that, "You have the right under HIPAA, or as required by law, to be notified if there is a breach of your unsecured medical information. If requested, this notification may be provided to you

---

[3] MedStar Health, *Terms of Use (Patient Portal and Secure Messaging)*, https://www.medstarhealth.org/patient-privacy-policy.

electronically."

11.     Defendants' conduct gives rise to at least six causes of action against MedStar and/or Cerner: (1) violation of the Electronic Communications Privacy Act ("ECPA") 18 U.S.C. § 2510, *et seq.* and 18 U.S.C. § 2701, *et seq.*; (2) violation of the Maryland Wiretapping and Electronic Surveillance Act ("Maryland Wiretap Act"), Md. Code Ann., Cts. and Jud. Proc., § 10-401 *et seq.* (2021); (3) violation of Md. Code Ann., Health Gen. § 4-301 *et seq.* (2021) ("Maryland Confidentiality of Medical Records Act"); (4) invasion of privacy – intrusion upon seclusion; (5) breach of contract; and (6) trespass to chattels.

12.     As a result of Defendants' conduct, Defendants caused damage to Plaintiffs and patient Class members in that:

    a.     Sensitive and confidential information that Plaintiffs and the Patient Class intended to remain private is no longer private;

    b.     Defendants eroded the essential confidential nature of the provider-patient relationship;

    c.     Defendants took something of value, to wit: personal data, from Plaintiffs and the Patient Class and derived benefit therefrom without Plaintiffs' or the Patient Class's knowledge, informed consent, or authorization and without sharing the benefit of such value;

    d.     Plaintiffs and the Patient Class did not get the full value of the medical services (including the patient portal) for which they paid, which included Defendants' duty to maintain confidentiality; and

    e.     Defendants' actions diminished the value of Plaintiffs' and the Patient Class's personal information.

## PARTIES TO THE ACTION

13.     Plaintiff John Doe I is a resident of Baltimore, Maryland, and a patient of Defendant MedStar Health, Inc. Plaintiff John Doe I has been a registered user of the myMedstar patient portal since 2019 and has used it regularly since that time until learning of, and being subject to, MedStar's practices as alleged herein.

14.     Plaintiff Jane Doe I is a resident of Baltimore, Maryland and a patient of Defendant MedStar Health, Inc. Plaintiff Jane Doe I has been a registered user of the myMedstar patient portal since 2018.

15.     Defendant MedStar Health, Inc. is a Maryland corporation with its principal place of business at MedStar Health, 10980 Grantchester Way, Columbia, MD 21044, located in Howard County. MedStar owns and operates numerous hospitals and health care providers in Maryland.

16.     Defendant MedStar is a covered entity under both Md. Code An., Health-Gen § 4-309 and the Health Insurance Portability and Accountability Act of 1996, 42 U.S.C. § 1320d and 45 C.F.R. Part 160-45 C.F.R. Part 162 and C.F.R. Part 164 ("HIPAA").

17.     Defendant Cerner Corporation is incorporated under the laws of the State of Delaware, with a principal place of business at 2800 Rockcreek Parkway, North Kansas City, Missouri. Cerner supplies health information technology services and operates Medstar's patient portal, myMedStar, and was acquired by Oracle Corporation in June 2022.

## JURISDICTION AND VENUE

18.     This Court has jurisdiction over this action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332, because: (a) this is a proposed class action in which there are at least 100 Class members; (b) the parties are minimally diverse, as at least one member of the proposed Class is domiciled in a different state than at least one Defendant; and (c) the combined claims of Class members exceed $5,000,000, exclusive of interest, attorneys' fees, and costs.

19.     This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because the action arises under the laws of the United States, specifically, the Electronic Communications Privacy Act ("ECPA").

20.     This Court additionally has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367(a), because they are so related to Plaintiffs' federal claims that they form part of the same case or controversy under Article III of the United States Constitution.

21.     This Court has personal jurisdiction over MedStar because MedStar has sufficient minimum contacts with this District in that it operates and markets its services throughout this District. Additionally, MedStar is headquartered in this District.

22.     This Court has personal jurisdiction over Cerner because Cerner has sufficient minimum contacts with this District in that it operates and markets its services throughout this District.

23.     Venue is also appropriate in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

## FACTUAL ALLEGATIONS

### *The MyMedStar Patient Portal*

24.     MedStar maintains and actively encourages its patients to use an online patient portal called myMedStar, which is currently accessible via the MedStar property at www.medstarhealth.org and https://mymedstar.iqhealth.com, where patients can communicate with MedStar for healthcare-related purposes like paying medical bills; viewing test results and prescriptions; requesting appointments; and  exchanging communications with providers. [4]

25.     Every page at www.medstarhealth.org includes a prominent link to the myMedStar

---

[4] MedStar, *Welcome to myMedStar*, https://www.medstarhealth.org/mymedstar-patient-portal.

patient portal. For example, the home page appears as depicted below—with the red circle added for emphasis.



26.    The same banner appears on all pages of www.MedStarHealth.org. For example, if a patient clicks to "Find a Doctor" from the home page, they are taken to the following screen, which includes the same prominent link to the myMedStar Patient Portal:



8

27.     When a patient clicks the "Patient Portal" link from any page on the www.MedStarHealth.org property, MedStar reports that activity to Google and sends the patient to the following page:



28.     MedStar contracts with a healthcare technology entity, Cerner, to provide and service certain aspects of the myMedStar patient portal.

29.     Cerner's products, which include the myMedStar patient portal, are in use at more than 27,000 facilities around the world.

30.     The MyMedStar patient portal, provided by Cerner and MedStar, is a service that provides patients and providers (in this case, the Plaintiffs and MedStar):

        a.      the ability to send and receive electronic communications;

        b.      computer storage of electronic health record and communications information; and

      c.     processing services for electronic information.

31.    Cerner publicizes its ability to maintain customer data securely in its services that provide the ability to exchange communications, store electronic health record and communications information, and process such information for patients and providers.

---

**Secure healthcare data**

Unfortunately, we know that retail, finance, and health data are the most targeted in security breaches. Patient privacy and the security of health data, when left unaddressed, threaten what the information of health exchange is solely meant to protect: patient safety. It's time to raise health data security to an unprecedented level of investment and focus.

…We'll continue to apply the same security-obsessed focus to healthcare as we do to all industries, allowing people, patients, providers, and payors to safely access insights that improve care and advance decision-making. [5]

---

32.    When a patient clicks to Enroll Now, MedStar reports the action to Google and sends the patient to the following page:

---

[5] Oracle Cerner, *Oracle's Acquisition of Cerner: The Future of Healthcare*, https://www.cerner.com/perspectives/oracle-acquisition-of-cerner-the-future-of-healthcare.



33.     Medstar discloses the patient's activity (and the patient's identifiers) to Google via www.Google-Analytics.com and www.Google.com.

34.     For patients who already have an account with the myMedStar Patient Portal, a click on the Login button will take the patient to the Patient Portal:



35.     Again, when a patient clicks the Login button, MedStar reports the patient's communication and their identifiers to Google.

36.     The myMedStar Patient Portal page depicted above is part of Cerner's service.

37.     When a patient goes to the Patient Portal to "Sign In," Google Source Code that Defendants have placed or permitted to be placed on the patient portal will deposit "first-party" cookies named _ga and _gid on the patient's computing device. As "first party" cookies, the _ga and _gid cookies are disguised as belonging to Cerner, which will permit them to be placed on the patient's device. In fact, however, the _ga and _gid cookies are Google cookies, not Cerner cookies.

38.     By disguising the Google cookies as belonging to Cerner instead of Google, Defendants are able to hack their way around attempts to block such tracking.

39.     Further, Defendants require patients to have first-party cookies enabled in order to access the Patient Portal, which further assures that Defendants will be able to deposit the Google cookies on patient computing devices while the patient is on and inside the Patient Portal.

40.     The link to "Privacy" on the Patient Portal Sign-In page sends users to MedStar's Notice of Privacy Practices that is posted on the www.medstarhealth.org property:[6]



---

[6] MedStar Health, *Patient Privacy Policy*, https://www.medstarhealth.org/patient-privacy-policy.

41.     This Notice of Privacy Practices is MedStar's HIPAA Privacy Notice, which provides a list of reasons for which MedStar may disclose patient information, that does not include the disclosures at issue in this case, and expressly promises:[7]

> **Your written authorization**
>
> Other uses and disclosures of your health information not covered by this Notice, or the laws that govern us, will be made only with your written authorization. These include the sale of your health information, use of your health information for marketing purposes, and certain disclosures of psychotherapy notes.

42.     The Notice of Privacy Practices is attached as Exhibit A to this Complaint.

43.     The link to "Terms" on the Patient Portal Sign-In page takes users to the Patient Portal Terms of Use at mymedstar.iqhealth.com/terms. This document incorporates the MedStar Notice of Privacy Practice by prominent hyperlink reference at the top of the page (that is emphasized in the red-circle in the screenshot below):



44.     The Patient Portal "Terms" also expressly reference and incorporate the Notice of Privacy Practices, as shown below:

---

[7] *Id.*

**GENERAL TERMS AND CONDITIONS**

By logging into this System, you agree that your access to and use of this System is a privilege, not a right, and that your access and use binds you to this Agreement. If you do not agree to the Terms of Use for this System, you may not use the System.

We may modify this Agreement at any time and without further notice. Any modifications made to this Agreement will be effective immediately upon posting directly to the login window or via link available on the login screen. By accessing or using the System, you agree to be bound by all of the terms and conditions of the Agreement as posted on the System at the time of your access or use. You agree to periodically review these Terms of Use, (available at the bottom of each page) to see if there are any changes that may affect you. Your continued use of the System signifies your continued agreement to these Terms. You further agree that a copy of MedStar Health's Notice of Privacy Practices is available to you at the bottom of each page of the System and provides information on how your Protected Health Information (PHI) is used at MedStar Health.

45.    The Terms are provided in full as Exhibit B to this Complaint.

46.    Despite these promises, Cerner's patient portal software permits the deployment of "custom analytics scripts" within myMedStar (and other patient portals provided by Cerner) including, for example, Google Analytics, Google Ads, and Google DoubleClick source code (collectively, "Google source code"), through which patient identifiers and communications content are divulged to Google while patients are exchanging communications with their healthcare providers and while the communications content is in electronic storage within Cerner's patient portal systems.

47.    Defendants knowingly and secretly deploy Google source code on the myMedStar login page and inside the myMedStar patient portal.

48.    The Google source code deployed on the patient portal system by the Defendants (1) deposits Google cookies on patient communications devices on and inside the patient; (2) disguises several Google cookies as being associated with Defendants rather than Google; (3) commands Plaintiffs' communications devices to re-direct identifiers and communications content on and inside the patient portal to Google.

49.    The source code deployed by Defendants redirects the following identifiers to Google:

       a.    Patient IP addresses;

       b.    Unique, persistent patient cookie identifiers;

       c.    Device identifiers;

    d.      Account numbers;

    e.      URLs;

    f.      Other unique identifying numbers, characteristics, or codes; and

    g.      Browser-fingerprints.

50.    The source code deployed by Defendants redirects the following communications content to Google on and inside the patient portal:

    a.      Actions to log-in to the Patient Portal;

    b.      Actions to Sign Up for the Patient Portal;

    c.      Actions to log-out of the Patient Portal;

    d.      Actions taken inside the Patient Portal, including but not limited to exchanging communications about the following:

        i.      "Dashboard"

        ii.      "myMedStar–Appointments" and "myMedStar/appointments/request"

        iii.      "myMedStar-Lab Results" and "health-record/results"

        iv.      "myMedStar … health-record/medications"

    e.      Any actions that patients take on the www.MedStarHealth.org property while logged-in to the Patient Portal, including searching or exchanging communications about a specific doctor, condition, or treatment

51.    These transmissions occur without patient knowledge, consent, authorization, or any further action by patients.

52.    By design, Google receives the exact contents of patients' communications while they are in storage in Defendants' systems but before the full response from MedStar to Plaintiffs

has been rendered on the screen of Plaintiffs' device.

53.     These transmissions to Google are not necessary for Defendants' websites or services to function. Instead, they allow MedStar to utilize patient PHI and communications for marketing purposes.

### *What Happens When a Patient Communicates with MedStar at Defendants' Patient Portal*

54.     When a patient first visits www.MedStarHealth.org, MedStar places Google cookies on the patient's computing device.

55.     The Google cookies that MedStar sets on patient communications devices include "first party" cookies that are disguised as belonging to MedStar and "third-party" cookies from Google associated with its marketing services to advertisers at www.Google.com and www.Doubleclick.net.

56.     With each communication that a patient exchanges at www.MedStarHealth.org, MedStar re-directs content of the communication alongside the patient's IP address, cookies and other device identifiers, and other information about the patient's device that is sufficiently unique to uniquely identify the device.

57.     For example, when a patient exchanges a communication through MedStar's search engine, MedStar will re-direct the precise content of the search and the patient identifiers to Google at Google's various domains.

58.     Similarly, when a patient exchanges a communication with MedStar relating to a specific doctor, condition, treatment, payment, or appointment, MedStar will re-direct the precise content of the communication and the patient identifiers to Google at Google's various domains.

59.     When a patient clicks to Log In to the myMedStar Patient Portal that is jointly maintained by MedStar and Cerner, MedStar again re-directs the precise content of the

communication of the patient's communication and the patient identifiers to Google at Google's various domains.

60.     When the patient logs-in to Defendants' Patient Portal, Defendants again re-direct the precise content of the patient's communication and the patient identifiers to Google at various Google domains.

61.     When a patient signs-in or exchanges a communication inside the portal, Defendants immediately place the content of that communication in storage within the Patient Portal.

62.     Defendants' immediate storage of the contents (and the identity of the person who was exchanging the communication) is required by federal law. *See* 45 C.F.R. § 164.312.

63.     After Defendants have stored the content of the communication but while the Patient Portal exchange with the patient is still occurring, the Defendants re-direct patient information to the following Google domains:

    a.      www.Google-Analytics.com

    b.      www.Google.com

    c.      www.doubleclick.net

**Re-directed Patient Identifiers to www.Google-Analytics.com**

64.     The patient identifiers that are re-directed to Google-Analytics include:

    a.      The patient's IP address;

    b.      The patient's User-Agent information and other data that, when combined, is sufficient to uniquely identify the device; and

    c.      Google cookies disguised as Defendants' cookies which serve as device identifiers and that Google connects to patients. These cookies include but

may not be limited to the _ga and _gid cookies.

**Re-directed Patient Identifiers to Google.com**

65.     The patient identifiers that are re-directed to Google.com include:

a.     The patient's IP address;

b.     The patient's User-Agent information and other data that, when combined, is sufficient to uniquely identify the device;

c.     Google cookies that uniquely identify the patient's device or, in the case of Google Account holders, their specific Google Account. The cookie that identifies that patient's device on Google.com is called NID. The cookies that identify the patient's specific Google Account are generally named in way that begins with the word Secure.

66.     If a Google Account holder has signed-in to a Google Account on the device in question and did not formally sign out before sending a separate communication to the myMedStar patient portal, then Defendants will re-direct both the device identifier cookie (NID) and the Google Account identifying cookies.

67.     If the Google Account holder is not signed in, Defendants will re-direct the device identifier only.

68.     By re-directing both cookies at the same time, Defendants enable Google to connect the NID device-identifying cookie to specific Google Account holder such that, once Google has made the connection, it only needs to see the NID cookie in order to connect a later re-directed communication with the specific Google Account holder.

69.     Regardless of a person's Google Account holder status, the NID cookie is a device identifier that is considered personally identifiable as a matter of law when the data includes

protected health information protected by federal law.

**Re-directed Patient Identifiers to Doubleclick.net**

70.     The patient identifiers that Defendants direct to www.Doubleclick.net include:

    a.     The patient's IP address;'

    b.     The patient's User-Agent information and other data that, when combined, is sufficient to uniquely identify the device;

    c.     Google cookies that uniquely identify the patient's device or, in the case of Google Account holders, their specific Google Account. The cookie that identifies that patient's device on Google.com is called IDE. The cookie that identifies the patient's specific Google Account is 'DSID.'

71.     Similar to re-directions to Google.com, if a Google Account holder has signed-in to a Google Account on the device in question and did not formally sign out before sending a separate communication to the myMedStar patient portal, then Defendants will re-direct both the device identifier cookie (IDE) and the Google Account identifying cookie (DSID).

72.     If the Google Account holder is not signed in, Defendants will re-direct the device identifier (IDE) only.

73.     By re-directing both cookies at the same time, Defendants enable Google to connect the IDE device-identifying cookie to specific Google Account holder such that, once Google has made the connection, it only needs to see the IDE cookie in order to connect a later re-directed communication with the specific Google Account holder.

74.     Regardless of a person's Google Account holder status, the IDE cookie is a device identifier that is considered personally identifiable as a matter of law when the data includes protected health information protected by federal law.

**Google Properties to Which Defendants Redirect Patient Data**

75.     For Google Analytics, Defendants re-direct patient identifiers and communications content to www.Google-Analytics.com/collect.

76.     For Google.com, Defendants re-direct patient identifiers and communications content to properties that include but may not be limited to:

    a.      www.google.com/ad/ga-audiences; and

    b.      adservice.google.com

77.     The Google property www.google.com/ad/ga-audiences is typically used to build "Custom Audiences" for purposes of "remarketing" or "retargeting" ads. This technology works by putting any person who takes a specific action within a "user list." The advertiser can use the user-list to engage in positive or negative retargeting. In the case of Defendants here, positive remarketing would involve sending specific ads to patients who had taken specific actions. For example, if MedStar sought to increase utilization of a specific type of service, it could positively target all patients who had gone to a specific page. Negative retargeting is the opposite. For example, if MedStar was seeking new patients, it could target its advertising campaign to exclude existing patients, *i.e.* any person who had logged-in to the myMedStar patient portal.

78.     For Doubleclick.net, Defendants re-direct patient identifiers and communications content to properties that include but may not be limited to:

    a.      Stats.g.doubleclick.net; and

    b.      8166114.fls.doubleclick.net.

**Defendants' Actions Permit Google to Connect the Data Across the Different Domains**

79.     Google publicly states that it connects data that advertisers and publishers (like the Defendants here) send to it across the different Google Analytics, Google.com, and

Doubleclick.net domains.

80.     Defendants use the same tools and source code throughout myMedStar. Thus, the types of Google cookies deposited on patient devices and the types of PHI and communications content explained above occur every time a MedStar patient takes an action within myMedStar.

### *Google's Advertising and Analytics Services*

81.     By many measures, Google is the world's largest data company. Among other services, Google operates the world's most popular search engine (Google), email provider (Gmail), video website (YouTube), mapping service (Google Maps), Internet analytics service for web developers (Google Analytics), and web-browser (Chrome). It also operates various ad services that are among the world's most popular in their respective category, including the advertising services of Google DoubleClick and Google AdWords.

82.     Google Analytics has massive reach. As described by the Wall Street Journal, it is "far and away the web's most dominant analytics platform" and "tracks you whether or not you are logged in."[8]

83.     Google specifically warns developers and advertisers that Google Analytics is not appropriate for HIPAA-covered entities like the Defendants, publicly stating:[9]

> Customers must refrain from using Google Analytics in any way that may create obligations under HIPAA for Google. HIPAA-regulated entities using Google Analytics must refrain from exposing to Google any data that may be considered Protected Health Information (PHI), even if not expressly described as PII in Google's contracts and policies. Google makes no representations that Google Analytics satisfies HIPAA requirements and does not offer Business Associate Agreements in connection with this service.

---

[8] *Who Has More of Your Personal Data than Facebook? Try Google*, The Wall Street Journal (April 22, 2018) (available at https://www.wsj.com/articles/who-has-more-of-your-personal-data-than-facebook-try-google-1524398401).
[9] Google, *HIPAA and Google Analytics,*
https://support.google.com/analytics/answer/13297105?hl=en

For HIPAA-regulated entities looking to determine how to configure Google Analytics on their properties, the HHS bulletin provides specific guidance on when data may and may not qualify as PHI. Here are some additional steps you should take to ensure your use of Google Analytics is permissible:

- Customers who are subject to HIPAA must not use Google Analytics in any way that implicates Google's access to, or collection of, PHI, and may only use Google Analytics on pages that are not HIPAA-covered.

- Authenticated pages are likely to be HIPAA-covered and customers should not set Google Analytics tags on those pages.

- Unauthenticated pages that are related to the provision of health care services, including as described in the HHS bulletin, are more likely to be HIPAA-covered, and customers should not set Google Analytics tags on HIPAA-covered pages..

- Please work with your legal team to identify pages on your site that do not relate to the provision of health care services, so that your configuration of Google Analytics does not result in the collection of PHI.

84.     Google tracks Internet users with IP addresses, cookies, geolocation, and other unique device identifiers.

85.     Google cookies are personally identifiable. For example, Google explains the following about certain cookies that it uses:

   a.     "[C]ookies called 'SID' and 'HSID' contain digitally signed and encrypted records of a user's Google account ID and most recent sign-in time."[10]

   b.     "Most people who use Google services have a preferences cookie called 'NID' in their browsers. When you visit a Google service, the browser sends this cookie with your request for a page. The NID cookie contains a unique

---

[10] *Privacy & Terms, Types of Cookies Used by Google*, Google, http://web.archive.org/web/20210916060858/https://policies.google.com/technologies/cookies?hl=en-US (archived from September 16, 2021).

ID Google uses to remember your preferences and other information[.]"[11]

c. "We use cookies like NID and SID to help customize ads on Google properties, like Google Search. For example, we use such cookies to remember your most recent searches, your previous interactions with an advertiser's ads or search results, and your visits to an advertiser's website. This helps us to show you customized ads on Google."[12]

d. "We also use one or more cookies for advertising we serve across the web. One of the main advertising cookies on non-Google sites is named 'IDE' and is stored in browsers under the domain doubleclick.net. Another is stored in google.com and is called ANID. We use other cookies with names such as DSID, FLC, AID, TAID, and exchange_uid. Other Google properties, like YouTube, may also use these cookies to show you more relevant ads."[13]

86. Google warns web-developers that Google marketing tools are not appropriate for every type of website or webpage, including health-related webpages and websites.

87. Google also warns developers in its Personalized Advertising policies page that "Health in personalized advertising" is a "Prohibited category" for Google's personalized advertising tools. Specifically, Google's advertising policies page states:[14]

We take user privacy very seriously, and we also expect advertisers to respect user

---

[11] *Privacy & Terms, Types of Cookies Used by Google*, Google, http://web.archive.org/web/20210101020222/https:/policies.google.com/technologies/cookies?hl=en-US (archived from January 1, 2021).
[12] *Id.*
[13] *Id.*
[14] *Advertising Policies Help, Personalized Advertising*, Google, http://web.archive.org/web/20191031223446/https:/support.google.com/adspolicy/answer/143465?hl=en (archived from October 31, 2019).

privacy. These policies define how advertisers are allowed to collect user data and use it for personalized advertising. They apply to advertisers using targeting features, including remarketing, affinity audiences, custom affinity audiences, in-market audiences, similar audiences, demographic and location targeting, and keyword contextual targeting. …

You aren't allowed to do the following:

> ❌ Collect information related to sensitive interest categories (see Personalized advertising policy principles below for more about sensitive interest categories)

88.     Google further states that "[a]dvertisers can't use sensitive interest categories to target ads or to promote advertisers' products or services."[15] "Health" is one such "[p]rohibited categor[y]" that Google states "can't be used by advertisers to targets ads to users or promote advertisers' products or services."[16]

## Health in personalized advertising

❌ Personal health conditions, health issues related to intimate body parts or functions, and invasive medical procedures. This also includes treatments for health conditions and intimate bodily health issues.

- **Examples**: treatments for chronic health conditions like diabetes or arthritis, treatments for sexually transmitted diseases, counseling services for mental health issues like depression or anxiety, medical devices for sleep apnea like CPAP machines, over-the-counter medications for yeast infections, information about how to support your autistic child

Health content includes:

- physical or mental health conditions, including diseases, chronic conditions, and sexual health
- health condition-related services or procedures
- products for treating or managing health conditions, including over-the-counter medications for health conditions and medical devices
- long or short-term health issues associated with intimate body parts or functions, including genital, bowel, or urinary functions
- invasive medical procedures, including cosmetic surgery
- disabilities, even when content is oriented toward the user's primary caretaker

89.     Google provides instructions for web developers to anonymize IP addresses when they use Google Analytics.[17] Google explains that the IP anonymization feature "is designed to

---

[15] *Id.*

[16] *Id.*

[17] Google, *Analytics Help, IP Anonymization (or IP Masking) in Universal Analytics*,

help site owners comply with their own privacy policies or, in some countries, recommendations from local data protection authorities, which may prevent the storage of full IP address information."[18] The Google IP anonymization instructions tell web developers to add a parameter called 'aip' in their Google Analytics source code. When 'aip' ("anonymize IP") is turned on, it will be reported to Google Analytics in a GET request with the following: '&aip=1'.[19]

90.     Defendants use the purported IP address anonymization tools with Google Analytics. However, there is no IP address anonymization tool for the Defendants' disclosures to Google   via   Google   Ads   or   Doubleclick   at   www.google.com/ad/ga-audience; adservice.google.com; stats.g.doubleclick.net; or 8166114.www.fls.doubleclick.net.

91.     The United States Department of Health and Human Services has made clear that "it is insufficient for a tracking technology vendor to agree to remove PHI from the information it receives or to de-identify the PHI before the vendor saves the information. Any disclosure of PHI to the vendor without individuals' authorizations requires the vendor to have a signed BAA in place and requires that there is an applicable Privacy Rule permission for disclosure."[20]

### *IP Addresses Are Personally Identifiable*

92.     An IP address is a number that identifies a computer connected to the Internet.

93.     IP addresses are used to identify and route communications on the Internet.

94.     IP addresses of individual Internet users are used by websites and tracking companies to facilitate and track Internet communications.

95.     Individual homes and their occupants can be, and are, tracked and targeted with

---

https://support.google.com/analytics/answer/2763052?hl=en.
[18] *Id.*
[19] *Id.*
[20] Office for Civil Rights, Department of Health and Human Services, *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates* (Dec. 1, 2022), https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html.

advertising using IP addresses.

96.     Under the Health Insurance Portability and Accountability Act ("HIPAA"), an IP address is considered personally identifiable information. See 45 C.F.R. § 164.514(b)(2)(i)(O).

97.     Cerner, itself, acknowledges that IP addresses are personally identifiable.

98.     Cerner's Privacy Policy states:[21]

**Cerner Health … uses IP addresses to identify individuals** violating the Terms of Use or who are threatening the service, web site, content, users, clients or others.
….
De-identified Information – We do not use or disclose your information for any purpose, other than as described in this Policy, without your permission. We will ask your permission to use your "de-identified" data if we wish to use it. De-identified data has your personally identifiable information removed and cannot be connected to you in any way.
….
**The information in health records is de-identified by removing the following person-specific information:… Internet Protocol (IP) address numbers.**

99.     Whenever a MedStar patient logs into or uses the myMedStar patient portal, Defendants use and cause the disclosure of the patient's IP addresses to Google, along with each re-directed communication described herein.

### *Internet Cookies Are Personally Identifiable*

100.     In the early years of the Internet, advertising on websites followed the same model as traditional newspapers. Just as a sporting goods store would choose to advertise in the sports section of a traditional newspaper, advertisers on the early Internet paid for ads to be placed on specific web pages based on the type of content displayed on the web page.

101.     Computer programmers eventually developed "cookies"—small text files that web servers can place on a person's web browser and computing device when that person's web browser interacts with the website server. Cookies can perform different functions, like saving a

---

[21] Cerner Health, *Privacy Policy*, https://cernerhealth.com/privacy (emphasis added).

user's login or other site settings. Eventually, some cookies were designed to acquire and record an individual Internet user's communications and activities on websites across the Internet.

102.   Cookies are designed to and, in fact, most often do operate as means of identification for Internet users.

103.   Cookies are protected personal identifiers under HIPAA. See 45 C.F.R. § 164.514(b)(2)(i)(H), (J), (M), (N), and (R).

104.   In general, cookies are categorized by (1) duration and (2) party.

105.   There are two types of cookies classified by duration:

a.   "Session cookies" are placed on a user's computing device only while the user is navigating the website that placed and accesses the cookie. The user's web browser typically deletes session cookies when the user closes the browser.

b.   "Persistent cookies" are designed to survive beyond a single Internet-browsing session. The party creating the persistent cookie determines its lifespan. As a result, a persistent cookie can acquire and record a user's Internet communications for years and over dozens or hundreds of websites. Persistent cookies are sometimes called "tracking cookies."

106.   Cookies are also classified by the party that uses the collected data:

a.   First-party cookies" are set on a user's device by the website with which the user is exchanging communications. For example, Defendants MedStar and/or Cerner set a collection of its own cookies on patients' browsers when they visit any webpage on MedStar's web properties. First-party cookies can be helpful to the user, server, and/or website to assist with security, log in,

and functionality.

b.  "Third-party cookies" are set on a user's device by website servers other than the website or server with which the user is exchanging communications. For example, the same patient who visits www.medstarhealth.org will also have cookies on their device from third parties, such as Google. Unlike first-party cookies, third-party cookies are not typically helpful to the user. Instead, third-party cookies are typically used for data collection, behavioral profiling, and targeted advertising.

107.  Data companies like Google have developed methods for monetizing and profiting from cookies. These companies use third-party tracking cookies to help them acquire and record user data and communications in order to sell advertising that is customized to that person's communications and habits. To build individual profiles of Internet users, third-party data companies assign each user a unique, or a set of unique identifiers to each user.

108.  Traditionally, first- and third-party cookies were kept separate. An Internet security policy known as the same-origin policy required web browsers to prevent one web server from accessing the cookies of a separate web server. For example, although Defendants can deploy source code that uses Google third-party cookies to help Google acquire and record the patient's communications, they are not permitted direct access to Google third-party cookie values. The reverse is also true: Google was not provided direct access to the values associated with first- party cookies set by Defendants.

109.  Google has designed a way to hack around the same-origin policy so that third-party data companies gain access to first-party cookies – and Defendants have adopted it.

110.  Javascript source code developed by third-party data companies and placed on a

webpage by developers such as Defendants can bypass the same-origin policy to send a first-party cookie value in a tracking pixel to the third-party data company. This technique is known as "cookie synching," and it allows two cooperating websites to learn each other's cookie identification numbers for the same user. Once the cookie synching operation is completed, the two websites can exchange any information they have collected and recorded about a user that is associated with a cookie identification number. The technique can also be used to track an individual who has chosen to use third-party cookie blockers.

111.    Whenever a MedStar patient uses myMedStar, Defendants use and cause the disclosure of patient cookie identifiers with each re-directed communication described herein, including patient communications about providers, conditions, treatments, appointments, bills, registration, and log-ins to the myMedStar patient portal.

112.    Defendants' cookie disclosures include the deployment of cookie synching techniques through which the Defendants deposit Google cookies on patient computing devices by disguising the Google cookies as belonging to the Defendants.

113.    The Defendants then re-direct the disguised Google cookies to Google.

### Browser-Fingerprints Are Personally Identifiable

114.    A browser-fingerprint is information collected about a computing device that can be used to identify the device.

115.    A browser-fingerprint can be used to identify a device when the device's IP address is hidden, and cookies are blocked.

116.    The Electronic Frontier Foundation has explained:

When a site you visit uses browser fingerprinting, it can learn enough information about your browser to uniquely distinguish you from all the other visitors to that site. Browser fingerprinting can be used to track users just as cookies do, but using much more subtle and hard-to-control techniques. In a paper EFF released in 2010,

we found that a majority of users' browsers were uniquely identifiable given existing fingerprinting techniques. Those techniques have only gotten more complex and obscure in the intervening years. By using browser fingerprinting to piece together information about your browser and your actions online, trackers can covertly identify users over time, track them across websites, and building an advertising profile of them.[22]

117.    In 2017, researchers showed that browser fingerprinting techniques can successfully identify 99.24 percent of users.[23]

118.    Browser-fingerprints are protected personal identifiers under HIPAA. See 45 C.F.R. § 164.514(b)(2)(i)(M), (R).

119.    Whenever a MedStar patient uses myMedStar, Defendants use and cause the disclosure of data sufficient to form a browser-fingerprint with each re-directed communication described herein.

***The Personally Identifiable Data and Communications Defendants Use and Disclose Without Patients' Knowledge, Consent, Authorization, or Further Action Has Value***

120.    The value of data that companies like Google extract from people who use the Internet is well understood and generally accepted in the e-commerce industry.

121.    Personal information is now viewed as a form of currency. Professor Paul M. Schwartz noted in the Harvard Law Review:

> Personal information is an important currency in the new millennium. The monetary value of personal data is large and still growing, and corporate America is moving quickly to profit from the trend. Companies view this information as a corporate asset and have invested heavily in software that facilitates the collection of consumer information.

---

[22] Katarzyna Szymielewicz and Bill Dudington, *The GDPR and Browser Fingerprinting: How It Changes the Game for the Sneakiest Web Trackers*, Electronic Frontier Foundation (June 19, 2018) (available at https://www.eff.org/deeplinks/2018/06/gdpr-and-browser-fingerprinting-how-it-changes-game-sneakiest-web-trackers).

[23] Yinzhi Cao, Song Li and Erik Wijmans, *(Cross-)Browser Fingerprinting via OS and Hardware Level Features*, Proceedings of the Network and Distributed Security Symposium (March 2017) (available at https://yinzhicao.org/TrackingFree/crossbrowsertracking_NDSS17.pdf).

Paul M. Schwartz, *Property, Privacy and Personal Data*, 117 HARV. L. REV. 2055, 2056-57 (2004).

122.    The cash value of Internet users' personal information can be quantified. In a 2015 study by the Ponemon Institute, researchers determined the value that American Internet users place on their "health condition" as more valuable than any other piece of data about them, with a minimum value of $82.90.[24]

123.    Medical information derived from medical providers garner even more value from the fact that it is not available to third party data marketing companies because of strict restrictions on provider disclosures under HIPAA, state laws, and provider standards, including the Hippocratic oath.

124.    Even with restrictions on the disclosure of personally identifiable health information, a robust market exists for the trade of de-identified health data.[25]

125.    Upon information and belief, Defendants were compensated for its disclosures of Plaintiffs' and Class members' personally identifiable patient data and communications by the third-party recipients in the form of enhanced marketing services or other compensation.

126.    Defendants did not pay or offer to pay Plaintiffs and Class members for their communications or personally-identifiable patient data associated with these disclosures before or

---

[24] Ponemon Institute, Privacy and Security in a Connected Life: A Study of US Consumers, March 2015, available at https://vdocuments.site/privacy-and-security-in-a-connected-life-protect-personal-information-from-being.html?page=1.

[25] *See* Adam Tanner, *How Data Brokers Make Money Off Your Medical Records,* Scientific American, https://www.scientificamerican.com/article/how-data-brokers-make-money-off-your-medical-records/ (February 1, 2016); Sam Thielman, *Your Private Medical Data is for Sale – and It's Driving a Business Worth Billions*, The Guardian, https://www.theguardian.com/technology/2017/jan/10/medical-data-multibillion-dollar-business-report-warns (January 10, 2017); Adam Tanner, *The Hidden Global Trade in Patient Medical Data,* YaleGlobal Online, https://archive-yaleglobal.yale.edu/content/hidden-global-trade-patient-medical-data.

after the disclosures were made.

127.   Defendants profited from Plaintiffs' and Class members' information without ever intending to compensate Plaintiffs and Class members or inform them that the disclosures had been made.

128.   Defendants were unjustly enriched by their conduct.

### *Defendants' Duties of Confidentiality*

### Duties Under Federal Law

129.    The HIPAA Privacy Rule protects patient health care information.

130.    Patient health care information in the United States is protected by federal law under HIPAA and its implementing regulations, which are promulgated by the HHS.

131.   The HIPAA Privacy Rule, located at 45 CFR Part 160 and Subparts A and E of Part 164, "establishes national standards to protect individuals' medical records and other individually identifiable health information (collectively defined as 'protected health information') and applies to health plans, health care clearinghouses, and those health care providers that conduct certain health care transactions electronically."[26]

132.   The Privacy Rule broadly defines "protected health information" ("PHI") as "individually identifiable health information" ("IIHI") that is "transmitted by electronic media; maintained in electronic media; or transmitted or maintained in any other form or medium." 45C.F.R. §160.103.

133.   IIHI is defined as "a subset of health information, including demographic information collected from an individual" that is: (1) "created or received by a health care provider, health plan, employer, or health care clearinghouse"; (2) "[r]elates to the past, present, or future

---

[26] Department of Health and Human Services, *Health Information Privacy* (Mar. 31, 2022), https://www.hhs.gov/hipaa/for-professionals/privacy/index.html.

physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual"; and (3) either (a) "identifies the individual" or (b) "[w]ith respect to which there isa reasonable basis to believe the information can be used to identify the individual." 45 C.F.R. §160.103.

134.    Under the HIPAA de-identification rule, "health information is not individually identifiable only if":(1) an expert "determines that the risk is very small that the information could be used, alone or in combination with other reasonably available information, by an anticipated recipient to identify an individual who is a subject of the information" and "documents the method sand results of the analysis that justify such determination'"; or (2) "the following identifiers of the individual or of relatives, employers, or household members of the individual are removed:

A. Names;
. . .
H. Medical records numbers;
. . .
J. Account numbers;
. . .
M. Device identifiers and serial numbers;
N. Web Universal Resource Locators (URLs);
O. Internet Protocol (IP) address numbers; … and
R. Any other unique identifying number, characteristics, or code…; and"
the covered entity must not "have actual knowledge that the information could be used alone or in combination with other information to identify an individual who is a subject of the information."

45 C.F.R. § 164.514.

135.    The HIPAA Privacy rule requires any "covered entity" – which includes health care providers – to maintain appropriate safeguards to protect the privacy of protected health information and sets limits and conditions on the uses and disclosures that may be made of protected health information without authorization. 45 C.F.R. §§ 160.103, 164.502.

136.    An individual or corporation violates the HIPAA Privacy Rule if it knowingly and

in violation of 42 U.S.C. §§ 1320d-1320d-9 ("Part C"): "(1) uses or causes to be used a unique health identifier; [or] (2) obtains individually identifiable health information relating to an individual." The statute states that a "person … shall be considered to have obtained or disclosed individually identifiable health information in violation of [Part C] if the information is maintained by a covered entity … and the individual obtained or disclosed such information without authorization." 42 U.S.C. § 1320d-6.

137.   An individual or corporation violates the HIPAA Privacy Rule if it knowingly and in violation of 42 U.S.C. §§ 1320d-1320d-9 ("Part C"): "(1) uses or causes to be used a unique health identifier; [or] (2) obtains individually identifiable health information relating to an individual." The statute states that a "person … shall be considered to have obtained or disclosed individually identifiable health information in violation of [Part C] if the information is maintained by a covered entity … and the individual obtained or disclosed such information without authorization." 42 U.S.C. § 1320d-6.

138.   An individual or corporation violates the HIPAA Privacy Rule if it knowingly and in violation of 42 U.S.C. §§ 1320d-1320d-9 ("Part C"): "(1) uses or causes to be used a unique health identifier; [or] (2) obtains individually identifiable health information relating to an individual." The statute states that a "person … shall be considered to have obtained or disclosed individually identifiable health information in violation of [Part C] if the information is maintained by a covered entity … and the individual obtained or disclosed such information without authorization." 42 U.S.C. § 1320d-6.

139.   Violation of 42 U.S.C. § 1320d-6 is subject to criminal penalties. 42 U.S.C. § 1320d-6(b). There is a penalty enhancement where "the offense is committed with intent to sell, transfer, or use individually identifiable health information for commercial advantage, personal

gain, or malicious harm." In such cases, the entity that knowingly obtains individually identifiable health information relating to an individual shall "be fined not more than $250,000, imprisoned not more than 10 years, or both."

<em>Patient Status is Among the Health Information Protected by HIPAA</em>

140.   Violation of 42 U.S.C. § 1320d-6 is subject to criminal penalties. 42 U.S.C. § 1320d-6(b). There is a penalty enhancement where "the offense is committed with intent to sell, transfer, or use individually identifiable health information for commercial advantage, personal gain, or malicious harm." In such cases, the entity that knowingly obtains individually identifiable health information relating to an individual shall "be fined not more than $250,000, imprisoned not more than 10 years, or both."

141.   Guidance from HHS confirms that patient status is protected by HIPAA. *In re Meta Pixel Healthcare Lit.,* Case No. 3:22-cv-03580-WHO, Dkt. 159 at 12, (N.D. Cal. Dec. 22, 2022) ("I agree that the information at issue here appears to show patient status and thus constitutes protected health information under HIPAA."), *Id.* at 15 ("[T]he Pixel captures information that connects a particular user to a particular health care provider – i.e., patient status – which falls within the ambit of information protected under HIPAA").

142.   Guidance from HHS confirms that patient status is protected by HIPAA:

> Identifying information alone, such as personal names, residential addresses, or phone numbers, would not necessarily be designated as PHI. For instance, if such information was reported as part of a publicly accessible data source, such as a phone book, then this information would not be PHI because it is not related to health data. … **If such information was listed with health condition, health care provision** or payment data, **such as an indication that the individual was treated at a certain clinic**, then this information would be PHI.[27]

---

[27] Office for Civil Rights, Department of Health and Human Services, *Guidance Regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule* at 5 (emphasis added) (Nov. 26, 2012), https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/coveredentities/De-

143.    HHS's guidance for marketing communications states that health care providers may not provide patient lists for marketing purposes without the consent of every included patient:

> The HIPAA Privacy Rule gives individuals important controls over whether and how their protected health information is used and disclosed for marketing purposes. With limited exceptions, the Rule requires an individual's written authorization before a use or disclosure of his or her protected health information can be made for marketing. … Simply put, a covered entity may not sell protected health information to a business associate or any other third party for that party's own purposes. Moreover, **covered entities may not sell lists of patients to third parties without obtaining authorization from each person on the list.**[28]

144.    HHS issued a Bulletin in December 2022 "to highlight the obligations" of health care providers and their business associates under the HIPAA Privacy Rule "when using online tracking technologies" such as the "Meta Pixel," which "collect and analyze information about how internet users are interacting with a regulated entity's website or mobile application."[29]

145.    In the Bulletin, HHS reminded covered entities that HIPAA applies to health care providers' use of tracking technologies like the Meta Pixel.[30] Among other things, HHS explained that health care providers violate HIPAA when they use tracking technologies that disclose an individual's identifying information (like an IP address) even if no treatment information is included and even if the individual does not have a relationship with the health care provider:

> How do the HIPAA Rules apply to regulated entities' use of tracking technologies?

---

identification/hhs_deid_guidance.pdf.

[28] Office for Civil Rights, *Marketing* at 1-2 (emphasis added) (Apr. 3, 2003), https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/coveredentities/marketing.pdf.

[29] Office of Civil Rights, Department of Health and Human Services, *HHS Office of Civil Rights Issue Bulletin on Requirements under HIPAA for Online Tracking Technologies to Protect the Privacy and Security of Health Information* (Dec. 1, 2022), https://www.hhs.gov/about/news/2022/12/01/hhs-office-for-civil-rights-issues-bulletin-on-requirements-under-hipaa-for-online-tracking-technologies.html.

[30] Office for Civil Rights, Department of Health and Human Services, *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates* (Dec. 1, 2022), https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html.

Regulated entities disclose a variety of information to tracking technology vendors through tracking technologies placed on a regulated entity's website or mobile app, including individually identifiable health information (IIHI) that the individual providers when they use regulated entities' websites or mobile apps. This information might include an individual's medical record number, home or email address, or dates of appointments, as well as an individual's IP address or geographic location, medical device IDs, or any unique identifying code. All such IIHI collected on a regulated entity's website or mobile app generally is PHI, even if the individual does not have an existing relationship with the regulated entity and even if the IIHI, such as IP address or geographic location, does not include specific treatment or billing information like dates and types of health care services. **This is because, when a regulated entity collects the individual's IIHI through its website or mobile app, the information connects the individual to the regulated entity (*i.e.* it is indicative that the individual has received or will receive health care services or benefits from the covered entity), and thus relates to the individual's past, present, or future health or health care or payment for care.**[31]

146.    HHS explained that tracking technologies on health care providers' patient portals

"generally have access to PHI" and may access diagnosis and treatment information, in addition

to other sensitive data:

Tracking on user-authenticated webpages

Regulated entities may have user-authenticated webpages, which require a user to log in before they are able to access the webpage, such as a patient or health plan beneficiary portal or a telehealth platform. **Tracking technologies on a regulated entity's user-authenticated webpages generally have access to PHI.** Such PHI may include, for example, an individual's IP address, medical record number, home or email addresses, dates of appointments, or other identifying information that the individual may provide when interacting with the webpage. **Tracking technologies within user-authenticated webpages may even have access to an individual's diagnosis and treatment information, prescription information, billing information, or other information within the portal.** Therefore, a regulated entity must configure any user-authenticated webpages that include tracking technologies to allow such technologies to **only** use and disclose PHI in compliance with the HIPAA Privacy Rule and must ensure that the electronic protected health information (ePHI) collected through its website is protected and secured in accordance with the HIPAA Security Rule.[32]

147.    Tracking technology vendors like Google are considered business associates under

---

[31] *Id.* (emphasis added).
[32] *Id.* (emphasis added).

HIPAA if they provide services to RusMedStar and receive or maintain PHI, as they do:

> Furthermore, tracking technology vendors are business associates if they create, receive, maintain, or transmit PHI on behalf of a regulated entity for a covered function (*e.g.* health care operations) or provide certain services to or for a covered entity (or another business associate) that involve the disclosure of PHI. In these circumstances, regulated entities must ensure that the disclosures made to such vendors are permitted by the Privacy Rule and enter into a business associate agreement (BAA) with these tracking technology vendors to ensure that PHI is protected in accordance with the HIPAA Rules. For example, if an individual makes an appointment through the website of a covered health clinic for health services and that website uses third party tracking technologies, then the website might automatically transmit information regarding the appointment and the individual's IP address to a tracking technology vendor. In this case, the tracking technology vendor is a business associate and a BAA is required.[33]

148.    HIPAA applies to MedStar's webpages with tracking technologies *even outside the patient portal*:

> Tracking on unauthenticated webpages
>
> [T]racking technologies on unauthenticated webpages may have access to PHI, in which case the HIPAA Rules apply to the regulated entities' use of tracking technologies and disclosures to tracking technology vendors. Examples of unauthenticated webpages where the HIPAA Rules apply include: The login page of a regulated entity's patient portal (which may be the website's homepage or a separate, dedicated login page), or a user registration webpage where an individual creates a login for the patient portal … **[and pages] that address[] specific symptoms or health conditions, such as pregnancy or miscarriage, or that permits individuals to search for doctors or schedule appointments without entering credentials may have access to PHI in certain circumstances**. For example, tracking technologies could collect an individual's email address and/or IP address when the individual visits a regulated entity's webpage to search for available appointments with a health care provider. In this example, the regulated entity is disclosing PHI to the tracking technology vendor, and thus the HIPAA Rules apply.[34]

149.    And no PHI may be disclosed to tracking technology vendors like Google unless MedStar has properly notified its website users and entered into a business associate agreement with the vendor:

---

[33] *Id*.

[34] *Id*. (emphasis added).

Regulated entities may identify the use of tracking technologies in their website or mobile app's privacy policy, notice, or terms and conditions of use. However, the Privacy Rule does **not** permit disclosures of PHI to a tracking technology vendor based solely on a regulated entity informing individuals in its privacy policy, notice, or terms and conditions of use that it plans to make such disclosures. Regulated entities must ensure that all tracking technology vendors have signed a BAA and that there is an applicable permission prior to a disclosure of PHI.

If there is not an applicable Privacy Rule permission or if the vendor is not a business associate of the regulated entity, then the individual's HIPAA-compliant authorizations are required **before** the PHI is disclosed to the vendor. Website banners that ask users to accept or reject a website's use of tracking technologies, such as cookies, do **not** constitute a valid HIPAA authorization.

[I]t is insufficient for a tracking technology vendor to agree to remove PHI from the information it receives or de-identify the PHI before the vendor saves the information. Any disclosure of PHI to the vendor without individuals' authorizations requires the vendor to have a signed BAA in place **and** requires that there is an applicable Privacy Rule permission for disclosure.[35]

*The HHS Bulletin Was a Reminder to Covered Entities, Like MedStar, of Existing Duties – Not a Proclamation of New Policy*

150.    HHS's Bulletin did not create any new obligations or duties. Instead, it reminded covered entities of long-standing obligations with citations to existing guidance and rules that have been in place for decades.

151.    The Bulletin's first sentence explains that its purpose is "to highlight the obligation of [HIPAA]-covered entities and business associates … under the HIPAA [Privacy Rules] when using online tracking technologies[.]"[36]

152.    The Bulletin notes that "it has always been true that regulated entities may not impermissibly disclose PHI to tracking technology vendors," then explains how online tracking technologies violate the same HIPAA rules that have existed for decades.[37]

---

[35] *Id.*

[36] Office for Civil Rights, Department of Health and Human Services, *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates* (Dec. 1, 2022), https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html.

[37] *Id.*

153.    The Bulletin did not change or propose to change any existing rules – because the existing rules have long prohibited the types of conduct alleged in this Complaint and described in the bulletin.

154.    For example, the Bulletin states that:

All such [individually identifiable health information] collected on a regulated entity's website or mobile app generally is PHI, even if the individual does not have an existing relationship with the regulated entity and even if the IIHI, such as IP address or geographic location, does not include specific treatment or billing information like dates and types of health care services. This is because, when a regulated entity collects the individual's IIHI through its website or mobile app, the information connects the individual to the regulated entity (*i.e.,* it is indicative that the individual has received or will receive health care services or benefits from the covered entity), and thus relates to the individual's past, present, or future health or health care or payment for care.[38]

155.    To support this, the Bulletin cites "Modifications of the HIPAA [Rules], Final Rule," 78 FR 5566, 5598, *a rulemaking notice from January 25, 2013*, which stated:

[P]rotected health information … may not necessarily include diagnosis-specific information, such as information about the treatment of an individual, and may be limited to demographic or other information not indicative of the type of health care services provided to an individual. If the information is tied to a covered entity, then it is protected health information by definition since it is indicative that the individual received health care services or benefits from the covered entity, and therefore it must be protected … in accordance with the HIPAA rules.[39]

156.    The 2013 explanation from HHS is consistent with all other rules and regulations.

157.    In *Guidance Regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act Privacy Rule*, the Department instructed in 2012:

Identifying information alone, such as personal names, residential addresses, or phone numbers, would not necessarily be designated as PHI. For instance, if such information was reported as part of a publicly accessible data source, such as a phone book, then this information would not be PHI because it is not related to health data. . . . If such information was listed with health condition, health care provision or payment data, *such as an indication that the individual was treated at a certain clinic*, then this information would be PHI.

---

[38] *Id*.
[39] Available at https://www.govinfo.gov/content/pkg/FR-2013-01-25/pdf/2013-01073.pdf.

(emphasis added).[40]

158.    In its guidance for Marketing, HHS further instructed in 2003:

The HIPAA Privacy Rule gives individuals important controls over whether and how their protected health information is used and disclosed for marketing purposes. With limited exceptions, the Rule requires an individual's written authorization before a use or disclosure of his or her protected health information can be made for marketing. . . . Simply put, a covered entity may not sell protected health information to a business associate or any other third party for that party's own purposes. Moreover, *covered entities may not sell lists of patients to third parties without obtaining authorization from each person on the list.* Emphasis added.[41]

159.    On December 28, 2000, HHS specifically stated that "[t]he sale of a patient list to a marketing firm" is not permitted. 65 FR 82462, 82717.

160.    On January 25, 2013, HHS stated that, it would violate HIPAA "if a covered entity impermissibly disclosed a list of patient names, addresses, and hospital identification numbers." 78 FR 5566, 5642.

161.    In June 2022, HHS published guidance to consumers indicating again that their status as patients was protected when exchanging communications with covered entities, even on the Internet. In "Protecting the Privacy and Security of Your Health Information When Using Your Personal Cell Phone or Tablet,"[42] HHS stated the following:

    a.    "Your health information provides insight into the personal, often-sensitive details of your life. Protecting the privacy and security of this information,

---

[40] *Guidance Regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule,* at 5, https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/coveredentities/De-identification/hhs_deid_guidance.pdf (November 26, 2012).

[41] Office for Civil Rights, Department of Health and Human Services, *Marketing*, at 1-2, https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/coveredentities/marketing.pdf (April 3, 2003).

[42] Available at https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/cell-phone-hipaa/index.html (last visited March 21, 2023).

including what doctors you visit and what medical treatments or services you receive, allows you to control who has access to information about you, how much access they have, and when they have access. This enables you to protect yourself from potential discrimination, identity theft, or harm to your reputation."

b.    "The Health Insurance Portability and Accountability Act (HIPAA) Privacy and Security Rules protect the privacy and security of your medical and other health information when it is transmitted or maintained by covered entities (health plans, most health care providers, health care clearinghouses) and business associates (people and companies that provide certain services for covered entities). This information is referred to as protected health information (PHI), and it includes individually identifying information, such as your name, address, age, social security number, and location, *as well as* information about your health history, any diagnoses or conditions, current health status, and more."

c.    "The HIPAA Rules apply only when PHI is created, received, maintained or transmitted by covered entities and business associates."

d.    "[U]nless the app is provided to you by a covered entity or its business associate, the HIPAA Rules also do not protect the privacy of data you've downloaded or entered into mobile apps for your personal use, regardless of where the information came from."

162.    The underlined language "unless the app is provided to you by a covered entity or its business associate" is a hyperlink to *HHS Guidance published in 2016, titled Health App Use*

*Scenarios & HIPAA*, which is available at: https://www.hhs.gov/sites/default/files/ocr-health-app-developer-scenarios-2-2016.pdf.

163.   This 2016 guidance from HHS specifies that:

a.   "If you work for [a covered entity], and as part of your job you are creating an app that involves the use or disclosure of identifiable health information, the entity … must protect that information in compliance with the HIPAA Rules. For extensive information on the requirements of the HIPAA rules and how to comply with them, please see http://www.hhs.gov/hipaa/index.html."

b.   "In all cases in which a covered entity is transmitted PHI, either itself or using a business associate, it must apply reasonable safeguards to protect the information[.]"

*HIPAA Only Contains a Single Exception for Disclosure of Patient Status Without Express Pre-Authorization, and Even Then, Patients May Opt-Out*

164.   Under 45 CFR § 154.510(a)(1), a covered entity may disclose a patient's name, location in the facility, condition in "general terms," and religious affiliation to (A) members of the clergy or (B) other persons who ask for the individual by name.

165.   Before providing a patient's name and location in the facility, the covered entity "must inform an individual of the protected health information that it may include in a directory and the persons to whom it may disclose such information … and provide the individual with the opportunity to restrict or prohibit some or all of the uses or disclosures permitted by" 45 C.F.R. § 154.510(a)(1).

166.   Under 45 CFR § 164.508(a)(3), "a covered entity must obtain an authorization for any use or disclosure of protected health information for marketing, except if the communication

44

is in the form of: (A) a face-to-face communication made by a covered entity to an individual; or (B) a promotional gift of nominal value provided by the covered entity."

167.    Under 45 CFR § 164.508(a)(4), "a covered entity must obtain an authorization for any disclosure of protected health information which is a sale of protected health information, as defined in § 164.501 of this subpart [and] [s]uch authorization must state that the disclosure will result in remuneration to the covered entity."

168.    Under 45 CFR § 164.501, "marketing means to make a communication about a product or service that encourages recipients of the communication to purchase or use the product or service."

169.    Under 45 CFR § 164.501, "financial remuneration" is defined as "direct or indirect payment from or on behalf of a third party whose product or service is being described. Direct or indirect payments does not include any payment for treatment of an individual."

170.    Under 45 CFR § 164.501 "treatment means the provision [or] management of health care and related services by one or more health care providers[.]"

*Floor Preemption: HIPAA Pre-empts All Weaker State Laws*

171.    HIPAA expressly preempts all State laws that are contrary to the HIPAA rules except where "[t]he provision of State law relates to the privacy of individually identifiable health information and is more stringent than a standard, requirements, or implementation specification adopted under [HIPAA]." 45 C.F.R. § 160.203(b).

172.    Other exceptions to pre-emption apply where either (1) the secretary of HHS makes a determination that the state law is necessary for certain express purposes; (2) provides for reporting of disease or injury, child abuse, birth, or death, or for the conduct of public health surveillance, investigation or intervention; or (3) requires a health plan to provide information for the purpose of audits or the license or certification of facilities or individuals.

45

173.    The Secretary of HHS has not issued a determination that any Maryland or other state law that does not protect patient-status is necessary for any of the purposes listed in 45 C.F.R. § 160.203.

174.    To the extent this Court determines that Maryland standards, requirements, and specifications regarding whether patient-status is protected is less stringent than HIPAA standards, then that Maryland standard, requirement, or specification is expressly preempted by HIPAA.

### Ancient and Modern Industry Standards of Patient Confidentiality

175.    A medical provider's duty of confidentiality to patients is ancient in origin.

176.    The original Hippocratic Oath, circa 400 B.C., provided that physicians must pledge, "What I may see or hear in the course of treatment or even outside of the treatment in regard to the life of man, which on no account must be spread abroad, I will keep to myself holding such things shameful to be spoken about."[43]

177.    The modern Hippocratic Oath provides, "I will respect the privacy of my patients, for their problems are not disclosed to me that the world may know."[44]

178.    A medical provider's duty of confidentiality to patients still applies today. In fact, the American Medical Association's ("AMA") Code of Medical Ethics contains numerous rules protecting the privacy of patient data and communications.

179.    AMA Code of Medical Ethics Opinion 3.2.1 provides:

Patients need to be able to trust that physicians will protect information shared in confidence. They should feel free to fully disclose sensitive personal information to enable their physician to most effectively provide needed services. Physicians in turn have an ethical obligation to preserve the confidentiality of information gathered in association with the care of the patient.

In general, patients are entitled to decide whether and to whom their personal health

---

[43] As recited in *Brandt v. Medical Defense Associates*, 856 S.W.2d 667, 671, n. 1 (Mo. 1993).

[44] Louis Lasagne, Hippocratic Oath—Modern Version, http://www.pbs.org/wgbh/nova/doctors/oath_modern.html.

information is disclosed.[45]

180.    AMA Code of Medical Ethics Opinion 3.1.1 provides:

Protecting information gathered in association with the care of the patient is a core value in health care. However, respecting patient privacy in other forms is also fundamental, as an expression of respect for patient autonomy and a prerequisite for trust. Patient privacy encompasses a number of aspects, including … personal data (informational privacy)[.] . . . *Physicians must seek to protect patient privacy in all settings to the greatest extent possible* and should: (a) Minimize intrusion on privacy when the patient's privacy must be balanced against other factors. (b) Inform the patient when there has been a significant infringement on privacy of which the patient would otherwise not be aware. [and] (c) Be mindful that individual patients may have special concerns about privacy in any or all of these areas.[46]

181.    AMA Code of Medical Ethics Opinion 3.2.4 provides:

Information gathered and recorded in association with the care of a patient is confidential. Patients are entitled to expect that the sensitive personal information they divulge will be used solely to enable their physician to most effectively provide needed services. Disclosing information to third parties for commercial purposes without consent undermines trust, violates principles of informed consent and confidentiality, and may harm the integrity of the patient-physician relationship. Physicians who propose to permit third-party access to specific patient information for commercial purposes should: (a) Only provide data that has been de-identified. [and] (b) Fully inform each patient whose record would be involved (or the patient's authorized surrogate when the individual lacks decision-making capacity) about the purpose(s) for which access would be granted.[47]

182.    AMA Code of Medical Ethics Opinion 3.3.2[48]  provides:

*Information gathered and recorded in association with the care of a patient is confidential, regardless of the form in which it is collected or stored.* Physicians who collect or store patient information electronically . . . must:. . . (c) release patient information only in keeping with ethics guidelines for confidentiality.

**Confidentiality Is a Cardinal Rule of the Provider-Patient Relationship**

183.    Patients are aware of their medical provider's duty of confidentiality, and, as a

---

[45] *Code of Medical Ethics Opinion 3.2.1*, AMA, https://www.ama-assn.org/delivering-care/ethics/confidentiality (last visited April 4, 2023).

[46] *Code of Medical Ethics Opinion 3.1.1*, AMA, https://www.ama-assn.org/delivering-care/ethics/privacy-health-care (last visited April 4, 2023).

[47] *Code of Medical Ethics Opinion 3.2.4*, AMA, https://code-medical-ethics.ama-assn.org/ethics-opinions/access-medical-records-data-collection-companies.

[48] *Code of Medical Ethics Opinion 3.3.2*, AMA, https://code-medical-ethics.ama-assn.org/ethics-opinions/confidentiality-electronic-medical-records (emphasis added).

result, have an objectively reasonable expectation that their health care providers will not share their personally identifiable data and communications with third parties in the absence of authorization for any purpose that is not directly related or beneficial to the patient's care.

184.    A 2020 national survey from CVS found, "Despite growing interest in tech-enabled health solutions, data privacy remains a key concern, ranking higher than personalized care and convenience of a doctor's office. In fact, 91% indicated privacy and data security (89%) were top priorities."[49]

185.    The 2021 CVS study found that 89% of respondents found privacy "e.g., keeping private health information confidential" the "most important" factor when deciding where to receive care. Eighty-eight percent of respondents found data security the most important factor.[50]

***Defendants Assure Patients That They Protects Patients' Personally Identifiable Information***

186.    Patients' reasonable expectations of privacy are further supported by express and implied promises by MedStar.

187.    The footer on the www.medstarhealth.org page includes a hyperlink for the "Patient Privacy Policy" which sends the patient to a page titled "Patient Privacy Policy" with the subheading "Notice of Privacy Practices for MedStar Health":

- "We are required by law to maintain the privacy of your health information…"

- "We do not sell your health information to any third party for their marketing activities unless you sign an authorization allowing us to do this."

---

[49] CVS Health, *The 2020 Path to Better Health Study*, p. 11, https://str.cvshealth.com/content/dam/enterprise/cvs-enterprise/pdfs/ingestion/cvs-health-path-to-better-health-study-2020.pdf.

[50] CVS Health, *The 2021 Health Care Insights Study*, p. 15, https://www.cvshealth.com/content/dam/enterprise/cvs-enterprise/pdfs/2021/cvs-health-health-care-insights-study-2021-report-executive-summary.pdf.

- "Other uses and disclosures of your health information not covered by this Notice, or the laws that govern us, will be made only with your written authorization. These include the sale of your health information, use of your health information for marketing purposes, and certain disclosures of psychotherapy notes."

188. The "Patient Privacy Policy" page does not disclose Defendants' secret deployment of Google advertising tools on its web properties, nor the disclosure of patient PHI and communications to third parties.

189. Cerner makes similar privacy promises to patients: [51]

- We are committed to protecting your privacy and the security of the information you entrust with us.

- We do not rent, sell or share personal information about you with other people or nonaffiliated companies…

- *Cerner Health* data is stored in a secure data facility, designed to protect against unauthorized access, use, or disclosure of the information contained within it. Our stringent physical and electronic security measures are regularly reviewed to ensure compliance with our policies and to manage and enhance our capabilities.

- De-identified Information – We do not use or disclose your information for any purpose, other than as described in this Policy, without your permission. We will ask your permission to use your "de-identified" data if we wish to use it. De-identified data has your personally identifiable information removed and cannot be connected to you in any way.

- De-identifying Person Health Information
The information in health records is de-identified by removing the following person-specific information:…Internet Protocol (IP) address numbers…And any other unique identifying number, characteristics, or code.

190. To find the mandated HIPAA policy, patients must navigate from the homepage to the "Patient Privacy Policy" tab. However, unbeknownst to the patient, these *patient privacy-related steps* were all being contemporaneously transmitted to Google.

---

[51] Cerner Health, *Privacy Policy*, available at https://cernerhealth.com/privacy.

191.    The very term "Patient Privacy Policy," in general, and as used by MedStar, is deceptive.

192.    Research has consistently shown that a majority of Americans who see that a website has a "Privacy Policy" falsely believe that the company with the policy cannot disclose information about them without their consent.

193.    By taking the action of associating the Patient Privacy Policy with the HIPAA Notice, MedStar gives patients the impression that it treats their communications at its web property with the same confidentiality that it treats patient communications at its physical properties.

194.    As a matter of law, there is no exception in HIPAA for communications between patients and providers that occur over the Internet.

*Plaintiffs' Reasonable Expectations of Privacy*

195.    As MedStar patients, Plaintiffs have a reasonable expectation of privacy that MedStar, their health care provider, and MedStar's business associate, Cerner, will not disclose their personally identifiable information or the content of their communications to third parties without their express authorization.

196.    Plaintiffs' and other MedStar patients' reasonable expectations of privacy in their personally identifiable data and communications exchanged with MedStar are derived from several sources, including:

      a.    MedStar's status as Plaintiffs' and other patients' health care provider;

      b.    Defendants' common law obligations to maintain the confidentiality of patient data and communications;

      c.    State and federal laws and regulations protecting the confidentiality of medical information;

d.    State and federal laws protecting the confidentiality of communications and computer data;

e.    State laws protecting unauthorized use of personal means of identification;

f.    Defendants' express promises of confidentiality; and

g.    Defendants' implied promises of confidentiality.

## CLASS ACTION ALLEGATIONS

197.    Plaintiffs re-allege and incorporate by reference the allegations set forth above.

198.    Plaintiffs bring this action as a class action pursuant to Rules 23(a), 23(b)(2), and (b)(3) of the Federal Rules of Civil Procedure, on behalf of the following classes:

**Medstar Patient Class** – All MedStar patients who used the myMedStar patient portal from November 14, 2021 until such time that Defendants remove Google source code from the myMedStar Patient Portal.

**Cerner Patient Class** – All patients in the United States who used patient portal communication services provided by Cerner where Google or other third-party source code was installed to place Google or other third-party cookies on patient devices and re-direct identifiers and communications content to Google while the patient was using a Cerner Patient Portal.

199.    Excluded from the Class are Defendants and any of its members, affiliates, parents, subsidiaries, officers, directors, employees, successors, or assigns; and the Court staff assigned to this case and their immediate family members. Plaintiffs reserve the right to modify or amend the Class definition, as appropriate, during the course of this litigation.

200.    This action has been brought and may properly be maintained on behalf of the Class proposed herein under the criteria of Rule 23 of the Federal Rules of Civil Procedure.

201.    **Numerosity—Federal Rule of Civil Procedure 23(a)(1)** – Class members are so numerous that their individual joinder is impracticable. The precise number of Class members and their identities are unknown to Plaintiffs at this time but will be determined through discovery

through the records of Defendants.

202.    **Commonality and Predominance—Federal Rules of Civil Procedure 23(a)(2) and 23(b)(3)** – Common questions of law and fact exist and predominate over questions affecting only individual Class members. These common legal and factual questions include the following:

a.    Whether Defendants' practices relating to disclosures of Plaintiffs' and Class Members' personally identifiable data and communications to third parties were intentional;

b.    Whether Defendants profited from disclosures to the third parties;

c.    Whether Defendants' conduct violate the Electronic Communications Privacy Act, 18 U.S.C. § 2510 *et seq.* and 18 U.S.C. § 2701, *et seq.*;

d.    Whether Defendants' conduct violate Md. Code. Ann. § 10-402;

e.    Whether Defendants' practices constitute an unauthorized intrusion upon seclusion;

f.    Whether placement of the Google cookies disguised as belonging to Defendants on patient computing devices is a highly offensive intrusion upon seclusion;

g.    Whether Defendant MedStar's practices constitute breach of contract;

h.    Whether Defendants' practices constitute breach of their duty of good faith and fair dealing;

i.    Whether Defendants' conduct violated Md. Code. Health § 4-309;

j.    Whether Defendants' practices constitute trespass to chattels;

k.    Whether Defendants' conduct harmed and continues to harm Plaintiffs and Class members, and if so, the extent of the injury;

l.      Whether and to what extent Plaintiffs and Class members are entitled to damages and other monetary relief;

m.      Whether and to what extent Plaintiffs and Class members are entitled to equitable relief, including, but not limited to, a preliminary and/or permanent injunction; and

n.      Whether and to what extent Plaintiffs and Class members are entitled to attorneys' fees and costs.

203.    **Typicality—Federal Rule of Civil Procedure 23(a)(3)** – Plaintiffs' claims are typical of the claims of the Class and Plaintiffs have substantially the same interest in this matter as other Class members. Plaintiffs have no interests that are antagonistic to, or in conflict with, the interests of the other members of the Class. Plaintiffs' claims arise out of the same set of facts and conduct as all other Class members. Plaintiffs and all Class members are patients of MedStar who used the myMedStar patient portals and are victims of Defendants' unauthorized disclosures to third-parties. All claims of Plaintiffs and Class members are based on Defendants' wrongful conduct and unauthorized disclosures.

204.    **Adequacy of Representation—Federal Rule of Civil Procedure 23(a)(4)** – Plaintiffs will fairly and adequately protect the interests of Class Members. Plaintiffs have retained competent counsel experienced in complex class action privacy litigation and Plaintiffs will prosecute this action vigorously. Plaintiffs have no interests adverse or antagonistic to those of the Class.

205.    **Declaratory and Injunctive Relief—Federal Rule of Civil Procedure 23(b)(2)** – Defendants acted or refused to act on grounds generally applicable to Plaintiffs and the other Class members, thereby making appropriate final injunctive relief and/or declaratory relief, as

described below.

206.    **Superiority—Federal Rule of Civil Procedure 23(b)(3)** – A class action is superior to all other available means for the fair and efficient adjudication of this controversy. The damages or other financial detriment suffered by individual Class Members are small compared with the burden and expense that would be entailed by individual litigation of their claims against Defendants. It would thus be virtually impossible for the Class Members, on an individual basis, to obtain effective redress for the wrongs done them. Furthermore, even if Class Members could afford such individualized litigation, the court system could not. Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts. Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action. By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court, and presents no unusual management difficulties under the circumstances here.

207.    Additionally, the Class may be certified under Rule 23(b)(1) or (b)(2) because:

a.      The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members that would establish incompatible standards of conduct for Defendants;

b.      The prosecution of separate actions by individual Class Members would create a risk of adjudications with respect to them which would, as a practical matter, be dispositive of the interests of other Class Members not parties to the adjudications, or substantially impair or impede their ability

to protect their interests; and/or

c.     Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final and injunctive relief with respect to the Class Members as a whole.

## COUNT I

### VIOLATION OF THE ELECTRONIC COMMUNICATIONS PRIVACY ACT, 18 U.S.C. § 2511(1)—Wiretap Interception

*On Behalf of MedStar Patient Class Against MedStar and the Cerner Patient Class Against Cerner*

208.    Plaintiffs individually and on behalf of the other Class members, repeat and reallege the foregoing paragraphs as if fully alleged herein.

209.    Title I of the ECPA, also known as the Wiretap Act, provides a private cause of action against any person who intercepts an electronic communication.

210.    A violation of the Wiretap Act occurs where any person "intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any . . . electronic communication[.]" 18 U.S.C. § 2511(1).

211.    The ECPA protects both the sending and receipt of electronic communications.

212.    The ECPA provides a private right of action to any person whose electronic communications are "intercepted, disclosed, or intentionally used" in violation of the ECPA.

213.    "Electronic communication" means "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system that affects interstate or foreign commerce." 18 U.S.C. § 2510(12).

214.    The transmissions of data between Plaintiffs and Class members and MedStar qualify as communications under the ECPA.

215.    "Intercept" under the ECPA means "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

216.    "Contents" includes "*any* information relating to the substance, purport, or meaning" of the communication at issue. 18 U.S.C. § 2510(8) (emphasis added).

217.    The contents of Plaintiffs' communications at issue include, but are not limited to:

      a.    That Plaintiffs logged into their myMedStar patient portal;

      b.    That Plaintiffs communicated with their providers through the myMedStar patient portal;

      c.    That Plaintiffs communicated with MedStar to view test results through the myMedStar patient portal;

      d.    That Plaintiffs communicated with MedStar to request appointments through the myMedStar patient portal;

      e.    That Plaintiffs communicated with MedStar to access medical records through the myMedStar patient portal; and

      f.    Searches and communications exchanged about specific doctors, conditions, and treatments.

218.    Defendants acquired the content of patient communications while patients were still exchanging communications with MedStar inside the patient portal.

219.    When a patient makes contact with myMedStar to exchange communications with their health care provider, a "TLS handshake" occurs that opens a line between the patient's communications device and the patient portal server. The line remains open and communications

continue to flow back-and-forth from the patient's communications device and Defendants' servers so long as the patient remains in myMedStar. The patient's communications with their health care provider flow through this open line. At the same time that the line is open and communications remain "in transit" between the patient's communications device and Defendants' servers, Defendants have also placed the content of the communication in temporary electronic storage and long-term storage, rendering a communication in transit, electronic storage, and storage all at the same time.

220.     Defendants procured Google (a third-party) to acquire the content of patient communications with MedStar while patients were still exchanging them with MedStar.

221.     Google acquired the content of patient communications with MedStar while patients were still exchanging them with MedStar.

222.     Defendants' conduct occurred through the use of "devices" within the meaning of the ECPA, 18 U.S.C. § 2510(5), including:

      a.     Cookies, including the Google cookies disguised as Defendants' cookies;

      b.     MedStar's web-servers;

      c.     Google's web-servers;

      d.     Cerner's web-servers; and

      e.     The Google source code described herein.

223.     Google is not a party to patient communications with MedStar.

224.     Cerner is not a party to patient communications with MedStar.

225.     MedStar is a party to patient communications with MedStar.

226.     The ECPA contains an exception for "interceptions" where the alleged interceptor is "a party to the communication or where one of the parties to the communication has given prior

consent to such interception." However, that exception does not apply where "such communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any state." 18 U.S.C. § 2511(2)(d).

227.    In acquiring the content of Plaintiffs and other patient Class members communications with MedStar, procuring Google to intercept the communications, and redirecting the content to Google, Defendants acted with purposes of committing criminal and tortious acts in violation of federal and state laws, including but not limited to:

a.     A criminal violation of 42 U.S.C. § 1320d-6 regardless of any subsequent purpose or use of the individually identifiable health data;

b.     A violation of HIPAA, particularly 42 U.S.C. § 1320d-6, which is a criminal offensive punishable by fine or imprisonment with increased penalties where "the offense is committed with intent to sell, transfer, or use individually identifiable health information for commercial advantage [or] personal gain;"

c.     A violation Md. Code Ann. § 4-301, *et seq*.;

d.     A knowing intrusion upon seclusion, including the unauthorized placement of Google cookies disguised as Defendants' cookies on patient computing devices; and

e.     Trespass upon Plaintiffs' and patient Class members' personal and private property via the placement of the Google cookies disguised as Defendants' cookies.

228.    Defendants acted without Plaintiffs' or patient Class members' consent.

229.    Although Plaintiffs consented to the Defendants acquiring their information for

purposes of providing medical care and access to their health records, Plaintiffs did not consent to Defendants' acquiring the information for purposes of re-directing it to Google.

230.    Plaintiffs did not consent to the Defendants' procurement of Google to intercept the content of their electronic communications relating to the Patient Portal.

231.    As a direct and proximate result of Defendants' violation of the ECPA, Plaintiffs and Class members were damaged by Defendants' conduct in that:

      a.      Defendants harmed Plaintiffs' and Class members' interest in privacy;

      b.      Sensitive and confidential information that Plaintiff and Class members intended to remain private is no more;

      c.      Defendants eroded the essential confidential nature of the provider-patient relationship;

      d.      Defendants took something of value from Plaintiffs and Class members and derived benefit therefrom without Plaintiffs' and Class members' authorization, informed consent, or knowledge, and without sharing the benefit of such value;

      e.      Plaintiffs and Class members did not get the full value of the medical services for which they paid, which included MedStar's duty to maintain confidentiality; and

      f.      Defendants' actions diminished the value of Plaintiffs and Class members' personal information.

232.    In violating the ECPA, Defendants' conduct was a knowing, conscious, and deliberate wrongdoing, and carried out with an evil or wrongful motive, an intent to injure Plaintiffs, or ill-will or fraud. Specifically:

a.  Defendants knew they had a duty to safeguard and keep confidential Plaintiffs' protected health information under the Maryland Confidentiality of Medical Records Act, HIPAA, the patient-provider relationship, and their express promises to Plaintiffs;

b.  Defendants knew that Plaintiffs reasonably expected their communications with Defendants to remain private;

c.  Defendants knew that Plaintiffs' communications involved private and sensitive matters concerning Plaintiffs' healthcare;

d.  Defendants knew they were prohibited by law from intercepting and disclosing Plaintiffs' communications;

e.  Defendant knew that their use of the tracking technology at issue violated their duties under HIPAA, as set forth in the December 2022 HHS Bulletin;

f.  Defendant knew that their interception and disclosure of Plaintiffs' communications violated the ECPA based on previously filed litigation concerning MedStar's conduct, *see Doe, et al. v. MedStar*, Baltimore City Circuit Court Case No. 24-C-20-000591;

g.  Defendants nonetheless knowingly and deliberately intercepted and disclosed to third-party advertisers Plaintiffs' health communications without Plaintiffs' consent, in a knowing violation of the ECPA;

h.  Defendants carried out their unlawful conduct with the wrongful and evil motive to appropriate Plaintiffs' private healthcare communications at Plaintiffs' expense and for Defendants' own financial gain; and

i.  Defendants' conduct was particularly egregious and reprehensible because

they acquired Plaintiffs' health communications in the context of the physician-patient relationship and under the guise of offering healthcare services to Plaintiffs.

233.    Plaintiffs, individually, on behalf of the Class members, seek all monetary and non-monetary relief allowed by law, including actual damages, statutory damages, punitive damages, preliminary and other equitable or declaratory relief, and attorneys' fees and costs.

## COUNT II

### VIOLATION OF THE ELECTRONIC COMMUNICATIONS PRIVACY ACT, 18 U.S.C. § 2511(3)—Wiretap Divulgence by an ECS Provider

### On Behalf of the MedStar Patient Class Against MedStar and the Cerner Patient Class Against Cerner

234.    Plaintiffs individually and on behalf of the other Class members, repeat and reallege the foregoing paragraphs as if fully alleged herein.

235.    The Wiretap portion of the Electronic Communications Privacy Act provides that "a person or entity providing an electronic communication service to the public shall not intentionally divulge the contents of any communication (other than one to such per or entity, or an agent thereof) while in transmission on that service to any person or entity other than an addressee or intended recipient of such communication or an agent of such addressee or intended recipient of such communication or an agent of such addressee or intended recipient."

236.    Google is not "an agent" of the patients, MedStar, or any other covered entity.

237.    An "electronic communication service" means "any service which provides to users thereof the ability to send or receive wire or electronic communications." 18 U.S.C. § 2510(15).

238.    MedStar is an electronic communication service provider with respect to the myMedStar patient portal because, according to MedStar, the myMedStar patient portal is "a free, secure online patient portal where you can keep track of your health information 24/7" to access

prescriptions, communications with your provider, medical records, test results, and appointments. Accordingly, myMedStar enables users to send and receive electronic communications about the topics listed by MedStar and more.

239.    Cerner is an electronic communication service provider with respect to the myMedStar patient portal as well because Cerner is the underlying provider of the myMedStar patient portal services.

240.    MedStar and Cerner's ECS services are "to the public" because they are available to any member of the general public that fits the qualification of being a patient of MedStar or any covered entity that uses Cerner's patient portal services. Any member of the public may become a patient of MedStar or Cerner because MedStar and Cerner make the services available to any person who presents as a patient, and are, in fact, required to provide medical services to members of the public. 42 U.S.C. §1395dd.

241.    The ECPA also provides that "[a] person or entity providing electronic communication service to the public may divulge the contents of any such communication—(i) as otherwise authorized in sections 2511(2)(a) or 2517 of this title; (ii) with the lawful consent of the originator or any addressee or intended recipient of such communication; (iii) to a person employed or authorized, or whose facilities are used, to forward such communication to its destination; or (iv) which were inadvertently obtained by the service provider and which appear to pertain to the commission of a crime, if such divulgence is made to a law enforcement agency." 18 U.S.C. § 2511(3)(b).

242.    None of the exceptions apply to this case.

243.    Section 2511(2)(a) applies only to disclosures to officers, employees or agents of an ECS in the "normal course of employment while engaged in any activity which is a necessary

incident to the rendition of his service or to the protection of the rights or property of the provider of that service." Disclosures to Google do not apply to this exception.

244.    Section 2517 applies only to interceptions by investigative or law enforcement officers. Disclosures to Google do not apply to this exception.

245.    The exception for "lawful consent" does not apply because Defendants did not obtain the "lawful consent" of any originator, addressee, or intended recipient of patient portal communications.

246.    There was no consent obtained at all from patients.

247.    Any purported consent from MedStar or any other covered entity to disclose communications content to Google relating to the patient portal was not "lawful consent" because it violates MedStar and other covered entity's obligations under federal and Maryland law.

248.    Google is not "a person employed or authorized, or whose facilities are used, to forward such communication to its destination."

249.    The communications in question were not "inadvertently obtained," do not "appear to pertain to the commission of a crime," and Google is not "a law enforcement agency."

250.    The "content" divulged by Defendants includes the following information concerning the substance, purport, or meaning of underlying communications:

    a.    That Plaintiffs logged-in to the myMedStar patient portal;

    b.    That Plaintiffs communicated with their providers in myMedStar;

    c.    That Plaintiffs requested appointments in myMedStar;

    d.    That Plaintiffs accessed medical records in myMedStar;

    e.    That Plaintiffs accessed test results in myMedStar; and

    f.    That Plaintiffs sent and received searches and communications about

specific doctors, conditions, and treatments while logged-in to myMedStar;

251.    When a patient makes contact with myMedStar to exchange communications with their health care provider, a "TLS handshake" occurs that opens a line between the patient's communications device and the patient portal server. The line remains open and communications continue to flow back-and-forth from the patient's communications device and Defendants' servers so long as the patient remains in myMedStar. Defendants divulge information regarding the substance, purport, and meaning of patient communications while communications are still in transit between the patient and MedStar or covered entities.

252.    As a direct and proximate result of Defendants' violation of the ECPA, Plaintiffs and Class members were damaged by Defendants' conduct in that:

    a.    Defendants harmed Plaintiffs' and Class members' interest in privacy;

    b.    Sensitive and confidential information that Plaintiff and Class members intended to remain private is no more;

    c.    Defendants eroded the essential confidential nature of the provider-patient relationship;

    d.    Defendants took something of value from Plaintiffs and Class members and derived benefit therefrom without Plaintiffs' and Class members' authorization, informed consent, or knowledge, and without sharing the benefit of such value;

    e.    Plaintiffs and Class members did not get the full value of the medical services for which they paid, which included MedStar's duty to maintain confidentiality; and

    f.    Defendants' actions diminished the value of Plaintiffs and Class members'

personal information.

253.   In violating the ECPA, Defendants' conduct was a knowing, conscious, and deliberate wrongdoing, and carried out with an evil or wrongful motive, an intent to injure Plaintiffs, or ill-will or fraud. Specifically:

a.   Defendants knew they had a duty to safeguard and keep confidential Plaintiffs' protected health information under the Maryland Confidentiality of Medical Records Act, HIPAA, the patient-provider relationship, and their express promises to Plaintiffs;

b.   Defendants knew that Plaintiffs reasonably expected their communications with Defendants to remain private;

c.   Defendants knew that Plaintiffs' communications involved private and sensitive matters concerning Plaintiffs' healthcare;

d.   Defendants knew they were prohibited by law from disclosing Plaintiffs' communications;

e.   Defendant knew that their use of the tracking technology at issue violated their duties under HIPAA, as set forth in the December 2022 HHS Bulletin;

f.   Defendant knew that divulging Plaintiffs' communications violated the ECPA based on previously filed litigation concerning MedStar's conduct, *see Doe, et al. v. MedStar*, Baltimore City Circuit Court Case No. 24-C-20-000591;

g.   Defendants nonetheless knowingly and deliberately divulged Plaintiffs' health communications to third-party advertisers without Plaintiffs' consent, in a knowing violation of the ECPA;

h.  Defendants carried out their unlawful conduct with the wrongful and evil motive to appropriate Plaintiffs' private healthcare communications at Plaintiffs' expense and for Defendants' own financial gain; and

i.  Defendants' conduct was particularly egregious and reprehensible because they acquired Plaintiffs' health communications in the context of the physician-patient relationship and under the guise of offering healthcare services to Plaintiffs.

254.  Plaintiffs, individually, on behalf of the Class members, seek all monetary and non-monetary relief allowed by law, including actual damages, statutory damages, punitive damages, preliminary and other equitable or declaratory relief, and attorneys' fees and costs.

## COUNT III

## VIOLATION OF THE ELECTRONIC COMMUNICATIONS PRIVACY ACT, 18 U.S.C. § 2702(a)(1)—Divulgence of Stored Communications Content by an ECS Provider

### *On Behalf of the MedStar Patient Class Against MedStar and the Cerner Patient Class Against Cerner*

255.  Plaintiffs individually and on behalf of the other Class members, repeat and reallege the foregoing paragraphs as if fully alleged herein.

256.  Title II, the Stored Communications Act portion of the Electronic Communications Privacy Act, provides that "a person or entity providing an electronic communication service to the public shall not knowingly divulge to any person or entity the contents of a communication while in electronic storage by that service." 18 U.S.C. § 2702(a)(1).

257.  Defendants are ECS providers as set forth above.

258.  Defendants' services are provided "to the public" as set forth above.

259.  The contents at issue are the same as set forth above.

260.  "Electronic storage" means "(A) any temporary, intermediate storage of … a[n]

electronic communication incidental to the electronic transmission thereof; and (B) any storage of such communication by an ECS for purposes of backup protection of such communication." 18 U.S.C. § 2510(17).

261.    When a patient exchanges communications in the patient portal, Defendants immediately place the contents of those communications in "temporary, intermediate storage" that is "incidental to the electronic transmission thereof," and "for purposes of backup protection of such communication."

262.    The "backup protection" storage is required as a matter of federal law for patient portals.

263.    The divulgences to Google occur while the communications are in transit and in electronic storage.

264.    Defendants' divulgences occur while the communications are in "electronic storage."

265.    Exceptions to liability are provided in 18 U.S.C. § 2702(b), permitting a provider to "divulge the contents of a communication—(1) to an addressee or intended recipient of such communication or an agent of such addressee or intended recipient; (2) as otherwise authorized in section 2517, 2511(2)(a), or 2703 of this title; (3) with the lawful consent of the originator or an addressee or intended recipient of such communication, or the subscriber in the case of remote computing service; (4) to a person employed or authorized or whose facilities are used to forward such communication to its destination; (5) as may be necessarily incident to the rendition of the service or to the protection of the rights or property of the provider of that service; (6) to the National Center for Missing and Exploited Children, in connection with a report submitted thereto under section 2258A; (7) to a law enforcement agency … (8) to a governmental entity [in certain

circumstances]; or (9) to a foreign government [in certain circumstances]."

266.   None of these exceptions apply.

267.   Google is not an addressee or intended recipient of patient communications in the myMedStar patient portal or any other patient portal service by Google.

268.   Divulgences to Google are not covered by section 2517, which relates to divulgences to governmental agencies and in court testimony.

269.   Divulgences to Google are not covered by Section 2511(2)(a), which provides that, "It shall not be unlawful under this chapter for an operator of a switchboard, or an officer, employee, or agent of a provider of wire or electronic communication service, whose facilities are used in the transmission of a wire or electronic communication, to intercept, disclose, or use that communication in the normal course of his employment while engaged in any activity which is a necessary incident to the rendition of his service or to the protection of the rights or property of the provider of that service, except that a provider of wire communication service to the public shall not utilize service observing or random monitoring except for mechanical or service quality control checks." This does not apply here because divulgences to Google are not a necessary incident to the rendition of patient portal services or to the protection of the rights or property of the Defendants.

270.   Divulgences to Google are not covered by Section 2703 because that section only relates to disclosures to governmental entities.

271.   The exception for "lawful consent" does not apply because Defendants did not obtain the "lawful consent" of any originator, addressee, or intended recipient of patient portal communications.

272.   There was no consent obtained at all from patients.

68

273.    Any purported consent from MedStar or any other covered entity to disclose communications content to Google relating to the patient portal was not "lawful consent" because it violates MedStar and other covered entity's obligations under federal and Maryland law.

274.    Google is not "a person employed or authorized, or whose facilities are used, to forward such communication to its destination."

275.    As a direct and proximate result of Defendants' violation of the ECPA, Plaintiffs and Class members were damaged by Defendants' conduct in that:

    a.    Defendants harmed Plaintiffs' and Class members' interest in privacy;

    b.    Sensitive and confidential information that Plaintiff and Class members intended to remain private is no more;

    c.    Defendants eroded the essential confidential nature of the provider-patient relationship;

    d.    Defendants took something of value from Plaintiffs and Class members and derived benefit therefrom without Plaintiffs' and Class members' authorization, informed consent, or knowledge, and without sharing the benefit of such value;

    e.    Plaintiffs and Class members did not get the full value of the medical services for which they paid, which included MedStar's duty to maintain confidentiality; and

    f.    Defendants' actions diminished the value of Plaintiffs and Class members' personal information.

276.    In violating the ECPA, Defendants' conduct was a knowing, conscious, and deliberate wrongdoing, and carried out with an evil or wrongful motive, an intent to injure

Plaintiffs, or ill-will or fraud. Specifically:

    a.    Defendants knew they had a duty to safeguard and keep confidential Plaintiffs' protected health information under the Maryland Confidentiality of Medical Records Act, HIPAA, the patient-provider relationship, and their express promises to Plaintiffs;

    b.    Defendants knew that Plaintiffs reasonably expected their communications with Defendants to remain private;

    c.    Defendants knew that Plaintiffs' communications involved private and sensitive matters concerning Plaintiffs' healthcare;

    d.    Defendants knew they were prohibited by law from disclosing Plaintiffs' communications;

    e.    Defendant knew that their use of the tracking technology at issue violated their duties under HIPAA, as set forth in the December 2022 HHS Bulletin;

    f.    Defendant knew that divulging Plaintiffs' communications violated the ECPA based on previously filed litigation concerning MedStar's conduct, *see Doe, et al. v. MedStar*, Baltimore City Circuit Court Case No. 24-C-20-000591;

    g.    Defendants nonetheless knowingly and deliberately divulged Plaintiffs' health communications to third-party advertisers without Plaintiffs' consent, in a knowing violation of the ECPA;

    h.    Defendants carried out their unlawful conduct with the wrongful and evil motive to appropriate Plaintiffs' private healthcare communications at Plaintiffs' expense and for Defendants' own financial gain; and

i.  Defendants' conduct was particularly egregious and reprehensible because they acquired Plaintiffs' health communications in the context of the physician-patient relationship and under the guise of offering healthcare services to Plaintiffs.

277.  Plaintiffs, individually, on behalf of the Class members, seek all monetary and non-monetary relief allowed by law, including actual damages, statutory damages, punitive damages, preliminary and other equitable or declaratory relief, and attorneys' fees and costs.

**COUNT IV**

**VIOLATION OF THE ELECTRONIC COMMUNICATIONS PRIVACY ACT,
18 U.S.C. § 2702(a)(2) – Divulgence of Stored Communications Content by an RCS Provider**

***On Behalf of the MedStar Patient Class Against MedStar and the Cerner Patient Class Against Cerner***

278.  Plaintiffs individually and on behalf of the other Class members, repeat and reallege the foregoing paragraphs as if fully alleged herein.

279.  Title II, the Stored Communications Act portion of the Electronic Communications Privacy Act, provides that "a person or entity providing a remote computing service to the public shall not knowingly divulge to any person or entity the contents of any communication which is carried or maintained on that service—(A) on behalf of, and received by means of electronic transmission from (or created by means of computer processing of communications received by means of electronic transmission from), a subscriber or customer of such service; (B) solely for the purpose of providing storage or computer processing services to such subscriber or customer, if the provider is not authorized to access the contents of any such communication for purposes of providing any services other than storage or computer processing." 18 U.S.C. § 2702(a)(1).

280.  A "remote computing service" is defined as "the provision to the public of computer storage or processing services by means of an electronic communications system."

281.    Defendants' patient portal(s) is a remote computing service because, as described by MedStar, the myMedStar patient portal stores patient records relating to prescriptions, communications with providers, medical records, test results, and appointments.

282.    Defendants' services are "to the public" for the reasons set forth above.

283.    The "content" at issue is the same as set forth above.

284.    The communications content is maintained on the patient portal on behalf of the patients and providers and received by electronic transmission from subscribers and customers.

285.    The communications are maintained on the patient portal solely for the purpose of providing storage of the records and computer processing services to subscribers and customers and Defendants are not authorized to use the information other than for the storage and processing.

286.    The exceptions set forth in 18 U.S.C. § 2702(b) also apply to remote computing service providers. These exceptions do not apply here for the same reasons set forth above.

287.    As a direct and proximate result of Defendants' violation of the ECPA, Plaintiffs and Class members were damaged by Defendants' conduct in that:

     a.    Defendants harmed Plaintiffs' and Class members' interest in privacy;

     b.    Sensitive and confidential information that Plaintiff and Class members intended to remain private is no more;

     c.    Defendants eroded the essential confidential nature of the provider-patient relationship;

     d.    Defendants took something of value from Plaintiffs and Class members and derived benefit therefrom without Plaintiffs' and Class members' authorization, informed consent, or knowledge, and without sharing the benefit of such value;

e.      Plaintiffs and Class members did not get the full value of the medical services for which they paid, which included MedStar's duty to maintain confidentiality; and

f.      Defendants' actions diminished the value of Plaintiffs and Class members' personal information.

288.    In violating the ECPA, Defendants' conduct was a knowing, conscious, and deliberate wrongdoing, and carried out with an evil or wrongful motive, an intent to injure Plaintiffs, or ill-will or fraud. Specifically:

a.      Defendants knew they had a duty to safeguard and keep confidential Plaintiffs' protected health information under the Maryland Confidentiality of Medical Records Act, HIPAA, the patient-provider relationship, and their express promises to Plaintiffs;

b.      Defendants knew that Plaintiffs reasonably expected their communications with Defendants to remain private;

c.      Defendants knew that Plaintiffs' communications involved private and sensitive matters concerning Plaintiffs' healthcare;

d.      Defendants knew they were prohibited by law from disclosing Plaintiffs' communications;

e.      Defendant knew that their use of the tracking technology at issue violated their duties under HIPAA, as set forth in the December 2022 HHS Bulletin;

f.      Defendant knew that divulging Plaintiffs' communications violated the ECPA based on previously filed litigation concerning MedStar's conduct, *see Doe, et al. v. MedStar*, Baltimore City Circuit Court Case No. 24-C-20-

73

000591;

g.      Defendants nonetheless knowingly and deliberately divulged Plaintiffs' health communications to third-party advertisers without Plaintiffs' consent, in a knowing violation of the ECPA;

h.      Defendants carried out their unlawful conduct with the wrongful and evil motive to appropriate Plaintiffs' private healthcare communications at Plaintiffs' expense and for Defendants' own financial gain; and

i.      Defendants' conduct was particularly egregious and reprehensible because they acquired Plaintiffs' health communications in the context of the physician-patient relationship and under the guise of offering healthcare services to Plaintiffs.

289.     Plaintiffs, individually, on behalf of the Class members, seek all monetary and non-monetary relief allowed by law, including actual damages, statutory damages, punitive damages, preliminary and other equitable or declaratory relief, and attorneys' fees and costs.

## COUNT V

## VIOLATION OF MARYLAND WIRETAPPING AND ELECTRONIC SURVEILLANCE ACT, MD. CODE ANN., COURTS AND JUDICIAL PROCEEDINGS, § 10-401, *et seq.*

### *On Behalf of Plaintiffs and the MedStar Patient Class Against All Defendants*

290.     Plaintiffs individually and on behalf of the other Class members, repeat and reallege the foregoing paragraphs as if fully alleged herein.

291.     Pursuant to Md. Code. Ann. § 10-402(a), it is unlawful for any person to "(1) Willfully intercept, endeavor to intercept, or procure any other person to intercept or endeavor to intercept, any…electronic communication; [or] (2) Willfully disclose, or endeavor to disclose, to any other person the contents of any…electronic communication, knowing or having reason to

know that the information was obtained through the interception of a…electronic communication…".

292.     Pursuant to Md Code Ann. § 10-402(d)(1)…a person or entity providing an electronic communication service to the public may not intentionally divulge the contents of any communication (other than one to the person or entity providing the service, or an agent of the person or entity) while in transmission on that service to any person or entity other than an addressee or intended recipient of the communication or an agent of the addressee or intended recipient."

293.     Any person aggrieved by a violation of Md. Code. Ann. § 10-402 whose "wire communications were intercepted, disclosed or used except as permitted or authorized by this section or whose personal or property interests or privacy were violated by means of an interception except as permitted by this section shall have a civil cause of action against any person who so intercepts, discloses, or uses such communications or who so violates his or her personal, property, or privacy interest."

294.     Under the statute, electronic communications means "any transfer of signs, signals, writing, images, sounds, data or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system." Md. Code. Ann. § 10-401.

295.     All communications between Plaintiffs and Defendants described herein qualify as electronic communications under Maryland law.

296.     Defendants' myMedStar patient portal is an electronic communication service to the public under Maryland law.

297.     Under the statute, person means, "any employee or agent of this State or a political subdivision thereof, and any individual, partnership, association, joint stock company, trust, or

corporation." Md. Code. Ann. § 10-401.

298.    Defendants qualify as such a person under the statute.

299.    "Interception" is defined as the "acquisition of the contents of any…electronic…communication through the use of any electronic, mechanical, or other device." Md. Code. Ann. § 10-401.

300.    "Contents" is defined to mean "any information concerning the identity of the parties to such communication or the existence, contents, substance, purport, or meaning of that communication." Md. Code. Ann. § 10-401.

301.    Defendants deploy Google source code on the myMedStar login page and through the myMedStar patient portal that causes Plaintiffs' PHI and communications content to be re-directed to Google.

302.    The contents of Plaintiffs' communications at issue include:

    a.    That Plaintiffs logged into their myMedStar patient portal;

    b.    That Plaintiffs communicated with their providers through the myMedStar patient portal;

    c.    That Plaintiffs communicated with MedStar to view test results through the myMedStar patient portal;

    d.    That Plaintiffs communicated with MedStar to request appointments through the myMedStar patient portal; and

    e.    That Plaintiffs communicated with MedStar to access mecial records through the myMedStar patient portal.

303.    Through their use of the Google source code, Defendants intercept, endeavor to intercept, disclose, endeavor to disclose, use, endeavor to use, divulge, and procure Google to

intercept, the content of Plaintiffs' communications while they are in transit and in transmission on the electronic communication service myMedStar.

304.    Defendants' conduct occurred through the use of "devices" under Maryland law, including:

    a.    Cookies;

    b.    MedStar's web-servers;

    c.    Google's web-servers;

    d.    Cerner's web-servers; and

    e.    The Google source code described herein.

305.    Under the statute, persons whose communications are intercepted in violation of the act "shall…be entitled to recover from any person (1) Actual damages but not less than liquidated damages computed at the rate of $100 a day for each day of violation or $1,000, whichever is higher; (2) Punitive damages; and (3) A reasonable attorney's fee and other litigation costs reasonably incurred." Md. Code. Ann. § 10-410.

306.    As a direct and proximate result of Defendants' violation of the Maryland Wiretapping and Electronic Surveillance Act, Plaintiffs and Class members were damaged by Defendants' conduct in that:

    a.    Defendants harmed Plaintiffs' and Class members' interest in privacy;

    b.    Sensitive and confidential information that Plaintiff and Class members intended to remain private is no more;

    c.    Defendants eroded the essential confidential nature of the provider-patient relationship;

    d.    Defendants took something of value from Plaintiffs and Class members and

derived benefit therefrom without Plaintiffs' and Class members' authorization, informed consent, or knowledge, and without sharing the benefit of such value;

e.    Plaintiffs and Class members did not get the full value of the medical services for which they paid, which included MedStar's duty to maintain confidentiality; and

f.    Defendants' actions diminished the value of Plaintiffs and Class members' personal information.

307.    In violating Md. Code Ann., 10-402, Defendants' conduct was a knowing, conscious, and deliberate wrongdoing, and carried out with an evil or wrongful motive, an intent to injure Plaintiffs, or ill-will or fraud. Specifically:

a.    Defendants knew they had a duty to safeguard and keep confidential Plaintiffs' protected health information under the Maryland Confidentiality of Medical Records Act, HIPAA, the patient-provider relationship, and their express promises to Plaintiffs;

b.    Defendants knew that Plaintiffs reasonably expected their communications with Defendants to remain private;

c.    Defendants knew that Plaintiffs' communications involved private and sensitive matters concerning Plaintiffs' healthcare;

d.    Defendants knew they were prohibited by law from intercepting, endeavoring to intercept, disclosing, endeavoring to disclose, using, endeavoring to use, divulging, and procuring Google to intercept, Plaintiffs' communications;

e.      Defendant knew that their use of the tracking technology at issue violated their duties under HIPAA, as set forth in the December 2022 HHS Bulletin;

f.      Defendant knew that their conduct violated Md. Code Ann, 10-402, based on previously filed litigation concerning MedStar's conduct, *see Doe, et al. v. MedStar*, Baltimore City Circuit Court Case No. 24-C-20-000591;

g.      Defendants nonetheless knowingly and deliberately intercept, endeavor to intercept, disclose, endeavor to disclose, use, endeavor to use, divulge, and procure Google to intercept, Plaintiffs' health communications without Plaintiffs' consent, in a knowing violation of Md. Code Ann, 10-402;

h.      Defendants carried out their unlawful conduct with the wrongful and evil motive to appropriate Plaintiffs' private healthcare communications at Plaintiffs' expense and for Defendants' own financial gain; and

i.      Defendants' conduct was particularly egregious and reprehensible because they acquired Plaintiffs' health communications in the context of the physician-patient relationship and under the guise of offering healthcare services to Plaintiffs.

308.    Plaintiffs, individually, on behalf of the Class members, seek all monetary and non-monetary relief allowed by law, including actual damages, statutory damages, punitive damages, preliminary and other equitable or declaratory relief, and attorneys' fees and costs.

## COUNT VI

## VIOLATION OF THE MARYLAND CONFIDENTIALITY OF MEDICAL RECORDS ACT, MD. CODE ANN., HEALTH GENERAL ARTICLE, § 4-301, *et seq.*

### *On Behalf of Plaintiffs and the MedStar Class Against the MedStar Defendant*

309.    Plaintiffs individually and on behalf of the other Class members, repeat and reallege

the foregoing paragraphs as if fully alleged herein.

310.   Maryland statutory law restricts the disclosure of medical records. Md. Code Ann. § 4-301, *et seq.*

311.   Section 4-301(j) defines medical records as: "any oral, written, or other transmission in any form or medium of information that: (i) Is entered in the record of a patient or recipient; (ii) Identifies or can readily be associated with the identity of a patient or recipient; and (iii) Relates to the health care of the patient or recipient."

312.   Plaintiffs and Class members' interactions with the myMedStar patient portal are medical records under the statute.

313.   Section 4-302(a) states that "[a] health care provider shall: (1) keep the medical record of a patient or recipient confidential."

314.   Section 4-302(d) provides that "[a] person to whom a medical record is disclosed may not redisclose the medical record to any other person unless: (1) The redisclosure is: (i) Authorized by the person in interest…"

315.   Section 4-302(e) further states that "a person may not disclose by sale, rental, or barter any medical record."

316.   Section 301(c) defines "Disclose" or "disclosure" to mean "the transmission or communication of information in a medical record, including an acknowledgment that a medical record on a particular patient or recipient exists."

317.   Section 4-309(c) states that a violation of the statute occurs when a health care provider or any other person "(1) Requests or obtains a medical record under false pretenses or through deception; or (2) Discloses a medical record in violation of this subtitle."

318.   Whenever Plaintiffs and Class members interacted with the myMedStar patient

portal, Defendants, through the Google source code described herein, intentionally disclosed, endeavored to disclose, redisclosed, and obtained under false pretenses, Plaintiffs' medical records without authorization or consent, in violation of Md. Code Ann. Health § 4-301 *et seq*.

319.    Section 4-309(f) establishes that "[a] health care provider or any other person who knowingly violates any provision of this subtitle is liable for actual damages."

320.    As a direct and proximate result of Defendants' violation of Md. Code Ann. Health § 4-301 *et seq*., Plaintiffs and Class members were damaged by Defendants' conduct in that:

    a.    Defendants harmed Plaintiffs' and Class members' interest in privacy;

    b.    Sensitive and confidential information that Plaintiff and Class members intended to remain private is no more;

    c.    Defendants eroded the essential confidential nature of the provider-patient relationship;

    d.    Defendants took something of value from Plaintiffs and Class members and derived benefit therefrom without Plaintiffs' and Class members' authorization, informed consent, or knowledge, and without sharing the benefit of such value;

    e.    Plaintiffs and Class members did not get the full value of the medical services for which they paid, which included MedStar's duty to maintain confidentiality; and

    f.    Defendants' actions diminished the value of Plaintiffs and Class members' personal information.

321.    For MedStar's violations, Plaintiffs and Class members seek nominal damages, general damages, compensatory damages, consequential damages, unjust enrichment, restitution,

and any other relief the Court deems just.

## COUNT VII

## INVASION OF PRIVACY—INTRUSION UPON SECLUSION

### *On Behalf of the MedStar Patient Class Against MedStar and Cerner Patient Class Against Cerner*

322.    Plaintiffs individually and on behalf of the other Class members, repeat and reallege the foregoing paragraphs as if fully alleged herein.

323.    Plaintiffs' and Class members' communications with MedStar constitute private conversations, matters, and data regarding private affairs and concerns.

324.    Plaintiffs and Class Members have a reasonable expectation that Defendants would not disclose personally identifiable patient data and communications to third parties for marketing purposes without Plaintiffs' and other Class members' authorization, consent, knowledge, or any further action on the patient's part.

325.    MedStar, a health care provider, has a duty to keep personally identifiable patient data and communications confidential.

326.    Cerner, as the operator of the myMedStar patient portal, has a duty to keep personally identifiable patient data and communications confidential.

327.    MedStar expressly promised to maintain the confidentiality of personally identifiable patient data and communications in its Patient Privacy Policy.

328.    Defendants intruded upon Plaintiffs' and Class members' seclusion by:

      a.    Placing Google cookies on patient computing devices that Defendants disguised as belong to the Defendants, effectively enabling Google to impersonate Plaintiffs' and Class members' healthcare provider for purposes of gaining access to their computing device and communications;

b.  Deploying source code designed to transmit patient data and communications on the patient portal to Google, effectively bugging its own properties that it promises are "secure"; and

c.  Causing the transmission of Plaintiffs' and Class members' patient data and communications content associated with the patient portal to Google.

329.  Plaintiffs and Class members did not authorize, consent, know about, or take any action to indicate consent to Defendants' conduct alleged herein.

330.  Plaintiff and Class members have reasonable expectations of privacy that Defendants (their health care provider and patient portal provider) would not place another entity's tracking tools on their personal computing devices disguised as belong to Defendants.

331.  Plaintiffs' and Class members' personally identifiable data and communications are the type of sensitive, personal information that one normally expects will be protected from disclosure to unauthorized parties by the very entity charged with safeguarding it. Further, the public has no legitimate concern in Plaintiffs' and Class members' personally identifiable data and communications, and such information is otherwise protected from exposure to the public by various statutes, regulations and other laws.

332.  Defendants' conduct described herein was intentional.

333.  Defendants' conduct in disclosing Plaintiffs' and Class members' personally identifiable data and communications to third parties was and is a substantial interference with seclusion that is highly offensive to a reasonable person.

334.  Defendants' intentional conduct in allowing access to and disclosure of Plaintiffs' and Class members' sensitive, personally identifiable data and communications to unauthorized third parties is such that it would cause serious mental injury, shame or humiliation to people of

ordinary sensibilities.

335.    As a direct and proximate result of Defendants' intrusion upon their seclusion, Plaintiffs and Class members were damaged in that:

    a.    Defendants harmed Plaintiffs' and Class members' interest in privacy;

    b.    Sensitive and confidential information that Plaintiff and Class members intended to remain private is no more;

    c.    Defendants eroded the essential confidential nature of the provider-patient relationship;

    d.    Defendants took something of value from Plaintiffs and Class members and derived benefit therefrom without Plaintiffs' and Class members' authorization, informed consent, or knowledge, and without sharing the benefit of such value;

    e.    Plaintiffs and Class members did not get the full value of the medical services for which they paid, which included Defendants' duty to maintain confidentiality; and

    f.    Defendants' actions diminished the value of Plaintiffs and Class members' personal information.

336.    As a result of the invasion of privacy caused by Defendants, Plaintiffs and Class members suffered and will continue to suffer damages and injury as set forth herein.

337.    In violating invading Plaintiffs' privacy, Defendants' conduct was a knowing, conscious, and deliberate wrongdoing, and carried out with an evil or wrongful motive, an intent to injure Plaintiffs, or ill-will or fraud. Specifically:

    a.    Defendants knew they had a duty to safeguard and keep confidential

Plaintiffs' protected health information under the Maryland Confidentiality of Medical Records Act, HIPAA, the patient-provider relationship, and their express promises to Plaintiffs;

b.      Defendants knew that Plaintiffs reasonably expected their communications with Defendants to remain private;

c.      Defendants knew that Plaintiffs' communications involved private and sensitive matters concerning Plaintiffs' healthcare;

d.      Defendants knew they were prohibited by law from disclosing Plaintiffs' communications;

e.      Defendant knew that their use of the tracking technology at issue violated their duties under HIPAA, as set forth in the December 2022 HHS Bulletin;

f.      Defendant knew that their use of the tracking technology at issue violated Plaintiffs' privacy based on previously filed litigation concerning MedStar's conduct, *see Doe, et al. v. MedStar*, Baltimore City Circuit Court Case No. 24-C-20-000591;

g.      Defendants nonetheless knowingly and deliberately redirected Plaintiffs' health communications to third-party advertisers, in violation of Plaintiffs' privacy rights;

h.      Defendants carried out their unlawful conduct with the wrongful and evil motive to appropriate Plaintiffs' private healthcare communications at Plaintiffs' expense and for Defendants' own financial gain; and

i.      Defendants' conduct was particularly egregious and reprehensible because they acquired Plaintiffs' health communications in the context of the

physician-patient relationship and under the guise of offering healthcare services to Plaintiffs.

338.    Plaintiffs, individually, on behalf of the Class members, seek all monetary and non-monetary relief allowed by law, including actual damages, statutory damages, punitive damages, preliminary and other equitable or declaratory relief, and attorneys' fees and costs.

## COUNT VIII

## BREACH OF CONTRACT

### On Behalf of Plaintiffs and the MedStar Patient Class Against MedStar

339.    Plaintiffs individually and on behalf of the other Class members, repeat and reallege the foregoing paragraphs as if fully alleged herein.

340.    MedStar requires myMedStar users like Plaintiffs and Class members to agree to its Terms of Use, located at https://mymedstar.iqhealth.com/terms.

341.    A valid and binding contract exists between MedStar and Plaintiffs and Class members, in the form of the Terms of Use and the Patient Privacy Policy located at https://www.medstarhealth.org/patient-privacy-policy.

342.    The contract specifies that Maryland law governs the parties' relationship.

343.    A user of MedStar's web properties would be shocked to learn that MedStar actively allowed Google to access Plaintiffs' and Class members' information regardless of whether they had the right to do so.

344.    In doing so, MedStar frustrated and undercut Plaintiffs' and Class Members' contractual rights, and unfairly interfered with Plaintiffs' and Class Members' rights under the parties' contract.

345.    MedStar breached its promises by allowing third parties, including Google, Google Analytics and Google Doubleclick to share Plaintiffs' and Class members' health information,

including their creation of patient portal accounts, access to patient portals, appointments, phone calls, and communications with MedStar about their doctors, diagnoses, conditions, treatments, prescription drugs, health insurance, symptoms, patient status, and other information alleged herein.

346.    MedStar breached its contract with Plaintiffs by imbedding and running source code on its web properties, contemporaneously and intentionally disclosing, and endeavoring to disclose the contents of Plaintiffs' and Class members' electronic communications to third parties, including Google, Google Analytics and Google Doubleclick, without authorization or consent.

347.    The patient health information that MedStar disclosed in breach of contract includes:

      a.      Plaintiffs' and Class members' identifiers including, but not limited to, email addresses, IP addresses, device identifiers, and browser fingerprint information;

      b.      The dates and times that Plaintiffs and Class members register for their myMedStar patient portals;

      c.      The dates and times that Plaintiffs and Class members log in and log out of myMedStar patient portals;

      d.      The content of communications that Plaintiffs and Class members exchange inside the myMedStar patient portals;

      e.      The content of Plaintiffs' and Class members' communications relating to appointments with Defendants; and

      f.      The content of Plaintiffs' and Class members' communications relating to their providers, treatments, conditions, symptoms, diagnoses, prognoses,

payment information, prescription drugs, and insurance information with MedStar.

348.     MedStar prevented Plaintiffs and Class members from receiving the full benefit of the contract by allowing third parties to access the content of their individually identifiable health information.

349.     In doing so, MedStar abused its power to define terms of the contract, including:

    a.    The interruption or preclusion of Plaintiffs' and Class members' ability to communicate with their health care providers on MedStar's websites;

    b.    The diminution in value of Plaintiffs' and Class members' protected health information;

    c.    The inability to use their computing devices for the purpose of communicating with MedStar;

    d.    The loss of privacy due to MedStar making sensitive and confidential information such as patient status and appointments that Plaintiffs and Class members intended to remain private no longer private;

    e.    MedStar took something of value from Plaintiffs and Class members and derived benefits therefrom without Plaintiffs' and Class members' knowledge or informed consent and without sharing the benefit of such value; and

    f.    The deprivation of the benefit of the bargain in that MedStar's contract did not state that it would share health information from Plaintiffs and Class members that they did not have the right to share.

350.     MedStar did not act fairly and in good faith.

351.   As a direct and proximate result of MedStar's breach of contract, Plaintiffs and Class Members did not receive the full benefit of the bargain, and instead received services from MedStar that were less valuable than described in their contract with MedStar, and were injured thereby.

352.   MedStar's breach caused Plaintiffs and Class members the following damages:

   a.   Nominal damages;

   b.   The interruption or preclusion of Plaintiffs' and Class members' ability to communicate with their health care providers on their websites;

   c.   The diminution in value of Plaintiffs' and Class members' protected health information;

   d.   The inability to use their computing devices for the purpose of communicating with their health care providers;

   e.   The loss of privacy due to MedStar's allowing disclosure of sensitive and confidential information such as patient status and appointments that Plaintiffs and Class members intended to remain private no longer private;

   f.   MedStar took something of value from Plaintiffs and Class members and derived benefits therefrom without Plaintiffs' and Class members' knowledge or informed consent and without sharing the benefit of such value; and

   g.   The deprivation of the benefit of the bargain in that the Patient Privacy Policy said MedStar would not share Plaintiffs' information, but MedStar did share Plaintiffs' and Class members' data.

353.   Plaintiffs, individually, on behalf of the Class members, seek all monetary and non-

monetary relief allowed by law, including actual damages, statutory damages, punitive damages, preliminary and other equitable or declaratory relief, and attorneys' fees and costs.

**COUNT IX**

**TRESPASS TO CHATTELS**

***On Behalf of the MedStar Patient Class Against MedStar and Cerner Patient Class Against Cerner***

354.    Plaintiffs individually and on behalf of the other Class members, repeat and reallege the foregoing paragraphs as if fully alleged herein.

355.    Plaintiffs and Class members owned, leased, or controlled their computing devices from which they communicated with MedStar.

356.    Whenever Plaintiffs and Class members interacted with MedStar's web properties, including the myMedStar patient portal, Defendants, through the source code it imbedded and ran on its web properties, contemporaneously and intentionally disclosed, and endeavored to disclose the contents of Plaintiffs' and Class members' electronic communications to third parties, including Google, Google Analytics and Google Doubleclick, without authorization or consent.

357.    Defendants imbedded this source code on Plaintiffs' and Class members' computing devices intentionally and without Plaintiffs' and Class members' knowledge or authorization.

358.    Imbedding the source code on Plaintiffs' and Class members' computing devices used and intermeddled with their computing devices. It is the modern equivalent of the placement of a bug in someone's telephone or on the desk where their computer sits. Google's source code has taken the place of the "bug," which is why these tools are often called "web bugs."

359.    Plaintiffs' and Class members' computing devices derive substantial value from their ability to facilitate communications with MedStar, which is integral to the intended function

of their devices.

360.    Imbedding source code results in the persistent and unavoidable interception of Plaintiff's and Class members' communications with their health care providers, which deprives Plaintiffs and Class members of the full value of using their computing devices for those communications.

361.    Plaintiffs' and Class members' devices are useless for exchanging private communications with health care providers or other covered entities imbed the source code on their websites, which substantially impairs the condition, quality, and value of Plaintiffs' and Class members' devices.

362.    Defendants' trespass into Plaintiffs' and Class members' computing devices caused them the following damages:

a.    Nominal damages for trespass;

b.    The total deprivation of the use of their computing devices to communicate with their health care providers or covered entities.

c.    Defendants' allowance of the repeated interception of Plaintiffs' and Class members' health information knowing it was done without consent is evidence of its malicious disregard of Plaintiffs' and Class members' property rights.

363.    In trespassing on Plaintiffs' chattel, Defendants' conduct was a knowing, conscious, and deliberate wrongdoing, and carried out with an evil or wrongful motive, an intent to injure Plaintiffs, or ill-will or fraud. Specifically:

a.    Defendants knew they had a duty to safeguard and keep confidential Plaintiffs' protected health information under the Maryland Confidentiality

of Medical Records Act, HIPAA, the patient-provider relationship, and their express promises to Plaintiffs;

b.   Defendants knew that Plaintiffs reasonably expected their communications with Defendants to remain private;

c.   Defendants knew that Plaintiffs' communications involved private and sensitive matters concerning Plaintiffs' healthcare;

d.   Defendants knew they were prohibited by law from disclosing Plaintiffs' communications;

e.   Defendant knew that their use of the tracking technology at issue violated their duties under HIPAA, as set forth in the December 2022 HHS Bulletin;

f.   Defendant knew that their use of the tracking technology at issue violated Plaintiffs' privacy and other rights based on previously filed litigation concerning MedStar's conduct, *see Doe, et al. v. MedStar*, Baltimore City Circuit Court Case No. 24-C-20-000591;

g.   Defendants nonetheless knowingly and deliberately trespassed on Plaintiffs' chattel to disclose Plaintiffs' health communications to third-party advertisers;

h.   Defendants carried out their unlawful conduct with the wrongful and evil motive to appropriate Plaintiffs' private healthcare communications at Plaintiffs' expense and for Defendants' own financial gain; and

i.   Defendants' conduct was particularly egregious and reprehensible because they trespassed on Plaintiffs' health communications in the context of the physician-patient relationship and under the guise of offering healthcare

services to Plaintiffs.

364.    Plaintiffs, individually, on behalf of the Class members, seek all monetary and non-monetary relief allowed by law, including actual damages, statutory damages, punitive damages, preliminary and other equitable or declaratory relief, and attorneys' fees and costs.

### REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the other Class members, respectfully requests relief against MedStar and Cerner as set forth below:

a.    Entry of an order certifying the proposed Class pursuant to Federal Rule of Civil Procedure 23;

b.    Entry of an order appointing Plaintiffs as representatives of the Class;

c.    Entry of an order appointing Plaintiffs' counsel as Class Counsel for the Class;

d.    Entry of an order for injunctive and declaratory relief as described herein, including but not limited to:

   i.    Enjoining MedStar, its affiliates, associates, officers, employees and agents from transmitting or disclosing Plaintiffs' and Class members' personally identifiable patient data and the contents of their communications to unauthorized third parties;

   ii.    Enjoining MedStar, its affiliates, associates, officers, employees and agents from taking Plaintiffs' and Class members' personally identifiable patient data and the contents of their communications, and any other data except that for which appropriate notice and consent is provided;

   iii.    Mandating that MedStar, its affiliates, associates, officers, employees and agents hire third-party monitors for a period of at least three years to ensure that all the above steps have been taken; and

93

iv.  Mandating that MedStar, its affiliates, associates, officers, employees and agents provide written verifications on a quarterly basis to the court and counsel for Plaintiffs in the form of a declaration under oath that the above steps have been satisfied.

e.  Enter judgment in favor of Plaintiffs and each of the other Class members for damages suffered as a result of Defendants' conduct alleged herein, including compensatory, statutory, and punitive damages; as well as equitable relief including restitution and disgorgement, to include interest and prejudgment interest;

f.  Award Plaintiffs their reasonable attorneys' fees and costs; and

g.  Grant such other and further legal and equitable relief as the court deems just and equitable.

## JURY DEMAND

Plaintiffs demand a trial by jury on all claims so triable.

Date: May 5, 2023        Respectfully submitted,

          */s/ Stephen G. Grygiel*
          Stephen G. Grygiel (MD No. 09169)
          stephengrygiel22@gmail.com
          **GRYGIEL LAW, LLC**
          127 Coventry Place
          Clinton, NY 13323

          Jason 'Jay' Barnes (*pro hac vice* forthcoming)
          jaybarnes@simmonsfirm.com
          Eric S. Johnson (*pro hac vice* forthcoming)
          ejohnson@simmonsfirm.com
          Jennifer Paulson (*pro have vice* forthcoming)
          jpaulson@simmonsfirm.com
          **SIMMONS HANLY CONROY**
          112 Madison Ave.
          7th Floor
          New York, NY 10016-7416

Amy C. Gunn (*pro hac vice* forthcoming)
agunn@simonlawpc.com
Elizabeth S. Lenivy (*pro hac vice* forthcoming)
elenivy@simonlawpc.com
**THE SIMON FIRM**
800 Market St.
Suite 1700
St. Louis, MO 63101

*Counsel for Plaintiffs and the Putative Class*